## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **DUSTIN J. KITTLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No.:** |
| | ) | |
| **JOSEPH R. BIDEN, JR**., in his official | ) | |
| capacity as President of the United States | ) | |
| of America, | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Dustin J. Kittle, by and through undersigned counsel, hereby brings this action for prospective declaratory and injunctive relief, and for the issuance of a writ of mandamus, against President Joseph R. Biden, Jr., in his official capacity.

This is an action for relief requiring President Joe Biden to perform his statutory obligation under the Farm Credit Act of 1971 to provide the Farm Credit Administration with a three-member Board. 12 U.S.C. § 2242. The legislature has uniquely imposed upon the President this obligation. Two of the three Members are in holdover status, and have been for years, due to the President's failure to perform his executive duty. The Farm Credit System and its borrowers are being harmed.

Case 1:24-cv-00025     Document 1     Filed 03/22/24     Page 1 of 65 PageID #: 1

# TABLE OF CONTENTS

INTRODUCTION ……………………………………………………………………...3

JURISDICTION AND VENUE ………………………………………………………4

PARTIES ……………………………………………………………………………4

LEGAL BACKGROUND ………………………………………………………………...5

    I.     Organization of the United States Farm Credit System……………………………...5

    II.    Regulation (or Lack Thereof) of the Farm Credit System…………………..……7

    III.   The Farm Credit System's Failure to Provide Protections for
its Farmer and Rancher Borrowers …………………………..…………………………10

        A.  Congress's Passage of the Agricultural Credit Act of 1987 to
Combat the System Institution's Free Rein to Abuse Borrowers ………..…...12

        B.  The Congressional Record Clearly Evidences the Intention
to Provide Borrowers a Private Cause of Action ………………………..………14

        C.  Administrative Review by the FCA as the Exclusive Remedy for
Violations of Borrowers' Rights by System Institutions ……………..…....18

        D.  Administrative Review by the FCA is Futile
for System Borrowers …………………………………………………………..………20

FACTUAL ALLEGATIONS…………………………………………………………21

    I.     Presidential Appointment of the FCA Board……………………………………21

    II.    The Problems Created by Board Members in Holdover Status………….……...24

    III.   An Absent, Partial Board Cannot Effectively or Adequately
Oversee the Farm Credit Administration……………………..…………………...26

        A.  Office of Examination Audit…………………………………..…...26

        B.  Office of Examination and Office of General Counsel Audit………………..30

        C.  Office of Data Analytics and Economics Audit………………………………32

    IV.   The Board's Inability to Effectively or Adequately Oversee the
Administration Allowed a System Institution to Go Rogue ……………………...39

    V.    A System Institution's Attorney Blatantly and Egregiously Retaliated
Against a Borrower for Complaining of
Violations of His Rights ………………….…………………………………...40

    VI.   The FCA Patently Failed at its Job to Regulate or Correct a System
Institution's Violations of Rights ………………………….……………….……45

    VII.  The FCA is Failing, and Has Failed, System Borrowers…………………………61

CLAIM FOR RELIEF…………………………………………………...……………63

    Count One: Violation of the U.S. Constitution, article II, § 3……………….………...63

**INTRODUCTION**

"It is imperative that [the Farm Credit Administration] continues to have a fully-functional board, and we urge the Biden Administration to quickly bring forward nominees for the two expired FCA Board positions".[1] "It is long overdue that we fill this Board seat, which has been vacant for several years, and I will also note that, while I appreciate the continued service of the two current Board Members, both of their terms have expired, and we urge the White House to quickly nominate people to fill those positions." *Hearing to Consider the Nomination of Jose Emilio Esteban, Vincent Logan and Alexis Taylor Before the Sen. Agriculture, Nutrition, and Forestry Comm.*, 117th Cong. (Sept. 22, 2022) (statement of Sen. Stabenow).

The President is uniquely obligated to provide a fully-functional Farm Credit Administration Board to ensure the safety and soundness of the Farm Credit System, which holds nearly $400 billion, or more than 40% of the country's agricultural debt, and has 640,000 stockholders (primarily farmers and ranchers). Because of the President's failure to do so, a private law firm was able to hijack a Farm Credit System institution, violate federal law, and engage in the extortion of System borrowers. Exhibit A and Exhibit B (Report to the Alabama State Bar Disciplinary Commission re: Alabama Farm Credit, ACA's Attorneys' misconduct).

---

[1] Farm Credit Council, *Farm Credit Urges Swift Approval of Board Nominee* (Sept. 22, 2022) (statement of President and CEO Todd Van Hoose). *Available at* https://farmcredit.com/press-release/farm-credit-urges-swift-approval-board-nominee.

## JURISDICTION AND VENUE

1.    This action arises under the United States Constitution and the Farm Credit Act of 1971 ("Act").

2.    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 1361. *See Minnesota Chippewa Tribe v. Carlucci*, 358 F. Supp. 973, 975-76 (D.C. Cir. 1973); *see also National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974).

3.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because this is an action against an officer of the United States in his official capacity, the Plaintiff resides in this judicial district, and the action does not involve real property.

## PARTIES

4.    Plaintiff Dustin Kittle is an adult citizen of Maury County, Tennessee.

5.    Mr. Kittle is a rancher and a former borrower of Alabama Farm Credit, ACA – a System institution – who was wrongfully divested of his Class A Voting Stock by operation of law.

6.    Mr. Kittle is an intended beneficiary of the Farm Credit Act of 1971.

7.    Defendant Joseph R. Biden, Jr. is President of the United States of America and is sued in his official capacity.

8.    Only President Biden is given the power to carry out the relief sought in this Complaint.

4

# LEGAL BACKGROUND

In 1909, President Theodore Roosevelt called upon the nation to preserve and protect the future of agriculture:

> I warn my countrymen that the great recent progress made in city life is not a full measure of our civilization; for our civilization rests at bottom on the wholesomeness, the attractiveness, and the completeness, as well as the prosperity, of life in the country. The men and women on the farms stand for what is fundamentally best and most needed in our American life. Upon the development of country life rests ultimately our ability, by methods of farming requiring the highest intelligence, to continue to feed and clothe the hungry nations; to supply the city with fresh blood, clean bodies, and clear brains that can endure the terrific strain of modern life; we need the development of men in the open country, who will be in the future, as in the past, the stay and strength of the nation in time of war, and its guiding and controlling spirit in time of peace.

*Report of the Country Life Commission and special message from the President of the United States to the Senate and House of Representatives.* (Feb. 9, 1909) (statement of President Theodore Roosevelt).

## I. Organization of the United States Farm Credit System.

Recognizing the need for a reliable source of funding to the disadvantaged class of American farmers and ranchers, the concept of a government-supervised agricultural credit system began as early as 1912. The Taft administration emphasized the "most essential point" was the system's need to be "surrounded and guarded by strict supervision" to ensure "honestly conducted institutions", saying:

> Again, the interest rate paid by the American farmer is considerably higher than that paid by our industrial corporations, railroads, or

municipalities. Yet, I think, it will be admitted that the security offered by the farmer in his farm lands is quite as sound as that offered by industrial corporations. Why, then, will not the investor furnish the farmer with money at as advantageous rates as he is willing to supply it to the industrial corporations?… As a later step it may prove advisable to urge the enactment by Congress of laws permitting the creation of national land-mortgage banks similar to those of Germany and France, with limited privileges, and surrounded and guarded by strict supervision… The most essential point to bear in mind is in the need for the assumption by the Federal and State Government of the responsibility for economically and honestly conducted institutions. Such assumption is the essential precedent for obtaining the confidence of the American as well as the European investing public. In this field, as in all others, there is room for harmful exploitation for personal gain. That must be guarded against… I now extend to you, with the governors of the other States, a cordial invitation to confer with me in Washington on the occasion of the next annual conference of governors, in order to consider means for the adoption of an agricultural credit system as a benefit to the American farmer[.]

*Preliminary report on land and agricultural credit in Europe*. (Oct. 11, 1912) (statement of President William H. Taft).

The Farm Credit System ("System") we know today began in 1916 as a government-sponsored enterprise ("GSE") with a statutory mandate – and limitation – to serve agriculture. It is the oldest GSE and the only direct lender among the GSEs.

The System is a nationwide network of financial institutions that provide credit to farmers, ranchers, residents of rural communities, agricultural and rural utility cooperatives, and other eligible borrowers. These System institutions are owned by their borrowers, who are required to purchase stock as part of their loans.

The System's sole regulator is the Farm Credit Administration ("FCA" or "Administration") – an independent agency in the executive branch. The FCA is responsible for chartering, examining, and supervising its institutions. It is the only financial regulator responsible for ensuring the safety and soundness of the System and its institutions. 12 U.S.C. § 2241 et seq.; *see also* 12 C.F.R. 600 et seq. The responsibility of managing the FCA is vested in the three-person Board appointed by the President, serving staggered 6-year terms. The President also designates a Board Chairman, who serves as the Chief Executive Officer of the FCA in this role.

## II.    Regulation (or Lack Thereof) of the Farm Credit System.

The System, System institutions, and FCA are largely unconstrained by *any* of the three branches of the federal government. Because the FCA is an independent agency, the Board Chairman does not report to the President. The FCA's administrative expenses come from funds assessed and collected annually from the institutions it regulates and examines. It receives tax benefits but operates without direct federal appropriations. And by statute, judicial review is unavailable when the FCA makes decisions as the regulator and enforcer of the System. The judiciary is also without power to require the FCA to act under 15 U.S.C. § 1607(a)(6).

The Act intimates that the specific entities it creates – the associations and banks – are to be operated much like other private lending institutions. The extensive anti-money-laundering laws Congress has enacted over the years are intended to

prevent private banking institutions from being used as vehicles to legitimize, or launder, the proceeds of illicit activities, such as drug-dealing, gambling, corruption, extortion, and kidnapping. Yet, FCA-regulated entities do not have to comply with these same anti-money-laundering laws or bank secrecy regulations now applicable to banks, thrifts, credit unions, and the like. For example, consider the following statements during a Hearing to review the Farm Credit System before the House Committee on Agriculture:

> Rep. SCOTT: When you look through your annual report, cows, chickens, everything in your annual report is farm-oriented. There is not a picture of a Verizon shop in there [referring to CoBank's $725 Million loan to Verizon to purchase European cell phone company Vodafone]. I want to be maybe a little more blunt than some of my other colleagues have. You are the regulator. I think the Farm Credit System is extremely important to the parts of the country that I represent. Certain people getting outside of the parameters of what the Farm Credit System was set up for, I believe, are putting the whole System at risk. As the regulator, I do think when you have an organization who is putting the System at risk, you do have the ability then to step in and stop that.

> And while what they are doing might be technically legal, it is certainly, in my opinion and apparently in the opinion of the majority of the Members of this Committee, who are your greatest advocates in Congress, that it is outside the scope and the intent of the Farm Credit System. I will just be honest with you. I don't think CoBank is going to stop until someone stops them. And I hope that you, as regulators, will work to get them back into what the scope of the Farm Credit System was set up for.

> Mr. Rawls, you have been with the Farm Credit System for a long time. Is that correct?

> Mr. RAWLS. I have been with FCA a little over 12 years.

Rep. SCOTT. And you are one of the ethics officers?

Mr. RAWLS. There is a Chief Ethics Official that is within my office. And I function as essentially an alternate or Deputy Ethics Official.

Rep. SCOTT. Are you aware of one of your institutions accessing confidential and proprietary information from a password-protected extranet of its competitor?

Mr. RAWLS. I am aware a number of years ago of probably the incident that you are referring to, yes.

Rep. SCOTT. If that happened to a private-sector institution, what do you think the consequences for the executives of that institution would be?

Mr. RAWLS. I really couldn't say. It depends so much on the facts and circumstances of any particular incident like that. I would say the agency in this case did follow up with our supervisory activities that we found appropriate at that time.

Rep. SCOTT. I think that bank would probably be shut down in the private-sector. What was the monetary payment for that conduct?

Mr. RAWLS. I would have to get the details on that and get back with you. I just don't recall.

Rep. SCOTT. I would appreciate it very much if you could get back to me with the details of the whole event and whether or not the people, the individuals whose information was accessed, were notified properly that their information had effectively been taken without authorization. And, again, the Farm Credit System is extremely important. I think that, I hope that you guys, as regulators—and I mean this with all sincerity— can keep within the scope of the original intent of the Act that was written. If not, I worry that the System may not exist in the future. And it is important to me and my community that it does exist and that it function as it was originally intended to.

*Hearing to Review the Farm Credit System Before the House Comm. on Agriculture*, 114th Cong. (Dec. 2, 2015) (statements of Rep. Scott and testimony of Hon. Charles Rawls, General Counsel, FCA).

The System is self-insured through the Farm Credit Service Insurance Corporation ("FCSIC"). All institutions are jointly and severally liable for the debts of the System. As such, regardless of where within the System insolvency may arise, the whole System is likely to fail if any single institution within the System fails. Every System institution is charged the same premium by the FCSIC per dollar of outstanding debt, regardless of the likelihood that a bank or association will become insolvent due to loan and investment losses or the rate at which it is growing. To put this succinctly, the stability of this System holding more than 40% of our nation's agricultural debt is self-governed, self-regulated, and self-determined by an FCA staff of around 300 employees, only 150 or so of whom are evaluating the soundness of the System. And given the System's joint-and-several liability, that stability could be dependent on such isolated factors as the price of wheat in Kansas that year if the FCA's soundness evaluation is inadequate or erroneous.

### III.    <u>The Farm Credit System's Failure to Provide Protections for its Farmer and Rancher Borrowers.</u>

System institutions are not subject to the same regulations and laws protecting borrowers' rights that are applicable to other lending institutions. The Truth-in-Lending Act ("TILA") exempts "credit transactions involving extensions of credit

primarily for business, commercial, or agricultural purposes..." 15 U.S.C. § 1603(1). As long as the extension of credit is primarily for business, commercial or agricultural purposes, this exemption will apply even if the extension of credit is secured by the borrower's residence or real property or if the transaction involves real property that includes a dwelling. *See* 12 C.F.R. § 226 supp. I, subpt. A, cmts. 3(a)-3(ii)(A) and 3(a)-8 (Regulation Z, which implements TILA). The Home Ownership and Equity Protection Act, implemented in 12 C.F.R. § 1026.3, Regulation Z, exempts transactions which involve "(a) business, commercial, agricultural, or organizational credit. (1) An extension of credit primarily for a business, commercial or agricultural purpose."

The Real Estate Settlement Procedures Act was enacted for the purpose of providing real estate consumers with greater and timely information concerning the nature and costs of the settlement process. 12 U.S.C. § 2601(a). The law applies to all "federally related mortgage loans", but 12 U.S.C. § 2606 specifically provides that RESPA "does not apply to credit transactions involving extensions of credit – (1) primarily for business, commercial, or agricultural purposes". Additionally, Section 3500.5 of Regulation X exempts from RESPA loans secured by property of 25 acres or more. 24 C.F.R. § 3500.5(b) (setting forth the exemptions from RESPA). The Fair Debt Collection Practices Act, 15 U.S.C.S. § 1692 et seq. is inapplicable where the debt is not incurred for personal, family or household purposes.

Essentially all transactions of System institutions are pursued for agricultural or business-related purposes and thus are exempted from the TILA, HOEPA, RESPA, and the FDCPA.

A. Congress's Passage of the Agricultural Credit Act of 1987 to Combat System Institutions' Free Rein to Abuse Borrowers.

In response to the mistreatment of System borrowers by System institutions during the farm crisis of the 1980s, the legislature introduced H.R. 3030, which would eventually become the Agricultural Credit Act of 1987.

> I am particularly proud to be the sponsor of legislation that spells out a borrowers bill of rights. The borrowers in this system have been abused, misled, coerced by Farm Credit Administration banks and officials who have sought to remake this system along new lines, but to the detriment of local control and cooperative principles. To protect against such abuses in the future, the bill provides borrowers with specific rights, including the following… Borrowers have the right to sue in Federal court any institution of the Farm Credit System for violating duties owed to the borrower…

S. 1156, 100th Cong., 1st Sess., 133 Cong. Rec. 6109 (May 6, 1987) (statement by Sen. Fowler). When introducing one of the Senate bills, Senator Pryor explained:

> The Farm Credit System was established to ensure the existence of a viable source of credit on reasonable terms for farmers at times when the market will not provide such credit. The Farm Credit System's historical mission has been to strengthen participation in agriculture, by broadening the availability of credit to borrowers. . . Unfortunately, during the crises of the past few years the managers of the Farm Credit System seem to have forgotten whom their cooperative was established to serve. In many parts of the country the Farm Credit System looked to foreclosure as a first resort rather than a last resort. . . The bill that we introduce today is aimed at reestablishing Farm Credit System

policies that will help farmers in need of help and at preserving local control of the Farm Credit System.

S. 1156, 100th Cong., 1st Sess., 133 Cong. Rec. 6102-03 (May 6, 1987). Senator

Melcher, upon introduction of the second Senate bill, stated:

> Before this crisis becomes a disaster, Mr. President, we must do something to lift this crushing burden from the back of rural America. We must get system interest rates down and stop the wholesale foreclosure and forced liquidation of family farms and ranches.

S. 1665, 100th Cong. 1st Sess., 133 Cong. Rec. 11725 (Aug. 7, 1987). In discussing

the testimony of the various witnesses to appear before the House committee, the

Report states:

> Dozens of witnesses representing farmer and commodity groups testified before the Committee as to two basic weaknesses in the way many System institutions have dealt with its problems. First, System lenders have been exceedingly reluctant to restructure individual loans on a case-by-case basis; and, second, the tensions and pressures on both borrowers and lenders, brought on by financial distress, have caused collapse of the traditional sense of comity and good will between the System and its borrower/owners.

H.R. Rep. No. 295(l), 100th Cong., 1st Sess. 62, *reprinted in* 1988 U.S. Code Cong. &

Admin. News 2723, 2733.The Report went on to state:

> Complaints about the rights of System borrowers being abused at both the association and district levels have been like a constant drumbeat in the offices of some Members of Congress for several years. The package of borrower rights adopted in H.R. 3030 reflect a common sense approach which should have been standard operating procedures in a cooperative, borrower-owned lending system.

*Id*. at 64, *reprinted in* 1988 U.S. Code Cong. & Admin. News at 2735.

The rights established for System borrowers by the Agricultural Credit Act of 1987 remain today. 12 U.S.C. §§ 2199-2202e. However, contrary to the testimony of the Congressional record, the Act does not provide borrowers an express private cause of action for violations of the Act, even when borrower rights under the Act have been unequivocally violated. Federal courts have refused to imply such a right, notwithstanding that the legislative history of the Farm Credit Amendments clearly shows the desire to create a private cause of action for borrowers.

B. The Congressional Record Clearly Evidences the Intention to Provide Borrowers a Private Cause of Acton.

Discussion in the House of Representatives centered on providing relief to System borrowers. The House Report found that:

> Additionally, the bill provides legal protection for borrowers that is needed to ensure that they receive fair treatment and due process, and that they are given every realistic opportunity to avoid liquidation and stay in business… The bill is designed to reduce those tensions by bolstering confidence in the System's financial stability and mandating fair and equitable treatment of the borrowers.

H.R. Rep. No. 425, 99th Cong., 1st Sess. 44, *reprinted in* 1985 U.S. Code Cong. & Admin. News 2587, 2597-98.

Individual legislators also made statements confirming that the new borrowers' rights included legal relief. For example, consider the following discussion between Representatives Penny and de la Garza, chairman of the House Committee on Agriculture and sponsor of the bill.

> Rep. PENNY: … I know you share with me the belief that applicants and member-borrowers need assurances throughout the process that they are being treated fairly. In addition to such guidelines and regulations, will this legislation provide [them] the option of utilizing the court system to ensure they are properly enforced?
>
> Rep. DE LA GARZA: Yes, Mr. Penny, as you indicate, a major section of this bill does establish a set of borrowers' rights, and it would be my understanding that the rights of applicants and member-borrowers as set forth in this Act and in the regulations of the Farm Credit Administration shall be enforceable in courts of law.

131 Cong. Rec. H11518-19 (daily ed. Dec. 10, 1985).

When H.R. 3030 reached the floor of the Senate after committee hearings, Senator Burdick[2] offered an amendment on the Senate floor to expressly provide that any person would have a right to sue under the Act. His concern was that the House bill, as written, eliminated the right to sue of persons who were not yet borrowers or who were former borrowers. He stated:

> Currently, any person has the right to sue these two entities. However, the House provision arguably limits this right to borrowers of the System. This restricts rights of persons who are not yet borrowers, or who are farmer-borrowers, to sue.
>
> My amendment simply cleans up this problem and restores the rights to all persons, whether borrowers or not.

133 Cong. Rec. S16995 (Dec. 7, 1987).

---

[2] Senator Quentin Burdick, a tireless fighter for rural America, began his career as a lawyer in private practice advising farmers who were threatened with foreclosure during the Great Depression. An opponent of the Eisenhower administration's farm policies, in his maiden speech on the House floor, Burdick called for the resignation of U.S. Secretary of Agriculture Ezra Taft Benson, who sought to remove government price supports and aid to farmers. The Quentin Burdick Center for Cooperatives was founded in his honor.

Senator Boren, chairman of the Senate Subcommittee on Agricultural Credit and floor manager for the bill, responded as follows:

> I am told that the House has unduly restricted the right of the borrower to bring suit and that this is the proposal in the House bill. It would be my thought . . . that we would oppose that House provision in the conference committee. That would have much the same effect as the adoption of the Burdick amendment would have without our attempting to write the actual language of the amendment here on the floor at this time.

Senator Lugar, ranking minority member of the Senate Agriculture Committee, stated:

> I would confirm the understanding that the distinguished Senator from Oklahoma and I have with the distinguished author of this amendment. We will in fact oppose the House amendment in conference. We understand the problem, and we would appreciate the Senator's not pursuing this amendment on this occasion with that assurance.

*Id.* On the basis of these assurances, Senator Burdick withdrew his amendment and the bill passed. This is both the best and only explicit explanation of why the private cause of action provision was eliminated at Conference. *See Zajac v. Fed. Land Bank*, 909 F.2d 1181, 1192 (8th Cir. 1990).

Notwithstanding the Congressional record, System institutions and the FCA have consistently and continually argued in federal courts that no express or implied private right of action exists for their violations of borrowers' rights under the Act and have won. *See e.g., Bowling v. Block*, 785 F.2d 556, 557 (6th Cir. 1986) ("We agree with the district court that the Farm Credit Act 'does not create enforceable

rights which would necessitate the existence of a private right of action,' … and that there is no support for the conclusion that Congress intended to create a private right of action under the Farm Credit Act in favor of these appellants.") (internal citations omitted). While some Federal Courts have recognized this precedent is in error, it remains binding precent in every federal circuit.

> We are always hesitant to create a conflict between circuits on important issues of the law. This is one instance, however, in which we should not hesitate to set forth our own view on the question of whether farm borrowers have a private right of action to enforce the borrowers' rights provisions of the Agricultural Credit Act of 1987. In my view, *Harper* was wrongly decided. *Harper* ignored the plain and mandatory language of the Act, wrongly decided that the major objective of the Act was to preserve the financial viability of the Farm Credit System and neglected the equally important objective of empowering farm borrowers with certain prescribed rights. *Harper* also refused to give weight to the clear statements of the managers of the bill on the floor of the Senate regarding the intent of Congress with respect to borrowers' rights. Finally, *Harper* wrongly concluded that Congress intended administrative review to be the exclusive remedy when, in fact, the Farm Credit Administration has neither entertained an action to enforce borrowers' rights nor possessed the power to do so. In sum, the failure to imply a private right of action contradicts the intent of Congress.

*Zajac v. Fed. Land Bank*, 909 F.2d 1181, 1184 (8th Cir. 1990) (Heaney, G., Senior Circuit Judge, dissenting, joined by Lay, D., Chief Judge) (rejecting *Harper v. Fed. Land Bank*, 878 F.2d 1172 (9th Cir. 1989)).

To this day, Congress has failed to correct this egregious error; and Federal Courts insist they cannot rewrite the law to reflect Congress's intentions. By woeful

default then, administrative review by the FCA remains the exclusive remedy for violations of borrowers' rights under the Act.

C. <u>Administrative Review by the FCA as the Exclusive Remedy for Violations of Borrowers' Rights by System Institutions.</u>

Contrary to Congressional understanding or aim, System borrowers are left with administrative review by the FCA as their sole recourse for violations of their rights under the Act.

> The plain fact, however, is that the FCA is in no position to effectively enforce the borrowers' rights provisions of the 1987 Act. There is no procedure for filing charges or complaints… Moreover, this record does not support the view that the FCA has either the ability or willingness to enforce the borrowers' rights provisions. The FCA has viewed its primary responsibility as one of examining the institutions in the System for financial condition, quality of management, soundness, and compliance with laws and regulations. During 1987, the FCA took only 24 enforcement actions, none of which sought compliance with the borrowers' rights provisions of the 1987 Act.

> Finally, even if the FCA with its limited resources wanted to enforce the borrowers' rights provisions of the Act, its authority to issue temporary cease-and-desist orders is unavailable because such orders can be issued only if the lender's violation is likely to cause insolvency or substantial dissipation of assets or earnings of the institution or otherwise seriously prejudice the interests of the investors in Farm Credit System obligations or shareholders in the institution. 12 U.S.C. § 2262(a). Similarly, its authority to suspend or remove officers extends only to those situations involving substantial financial loss, impairment of shareholder interests, or personal dishonesty. 12 U.S.C. § 2264(a).

> In sum, borrowers are, as a practical matter, unable to enforce their rights through administrative avenues.

*Zajac* 909 F.2d at 1193-95.

Administrative review is conducted by the FCA's Office of Congressional and Public Affairs ("OCPA"). Notably, the OCPA's Mission Statement[3] makes no mention whatsoever of its role in addressing System borrowers' complaints for violations of their rights under the Act. And in a letter from the OCPA dated June 12, 2023 to the Plaintiff in this case, the OCPA said:

> As the regulator for the System, FCA ensures that these institutions operate in a safe and sound manner and in compliance with applicable laws and regulations. FCA also looks into borrowers' or other interested parties' allegations of wrongdoing by System institutions. If we find that System institutions have violated applicable laws or regulations, FCA has several enforcement options to bring about corrective actions, including requiring management to address weakness in internal processes that led to those violations. However, FCA's authority does not include providing monetary or personal relief to an applicant or borrower. As an arm's length regulator, FCA cannot intervene in the business decisions made by System institutions unless those decisions violate applicable laws or regulations. Additionally, FCA does not mediate or adjudicate disputes between System institutions and borrowers.

This means that a System borrower whose rights under the Act have been, or are presently being violated, completely lacks the ability to have those rights either judicially enforced or administratively adjudicated by the FCA. To reiterate, a System institution can **outright** violate a borrower's rights under the Act without

---

[3] The OCPA's Mission Statement is: "The mission of the Office of Congressional and Public Affairs is 'to direct all agency congressional activities; to manage the coordination and production of all Agency public information and Agencywide internal communications; and to build awareness, support, and understanding of the important role the Farm Credit Administration plays in ensuring the prosperity of agriculture and rural America.'" *Accessible at* https://www.fca.gov/template-fca/about/OIGInspectionFCAExternalCommunicationProcess.pdf.

any liability or accountability for doing so. The borrower's only hope when faced with violations of their rights under the Act, such as being threatened with a wrongful foreclosure, is to plead for the FCA to exercise its discretionary enforcement powers and direct the System institution's management to stop the legal and/or regulatory violations in time to prevent the borrower's harm.

D. Administrative Review by the FCA is Futile for System Borrowers.

With so much at stake for System borrowers during the FCA's administrative review of complaints, a fully-functional FCA Board to oversee and ensure effectiveness and adequacy of the FCA's administrative review process is **absolutely imperative**. President Biden's failure to appoint Board Members to the vacancies has resulted in both an interference with the staggered-term plan of the statute and a de facto extension of the incumbents' terms of office. This has proven not only to be a handicap to the FCA but to deprive the System's borrowers of the benefit of the services incumbent upon the FCA to provide them.

Board Member Hall has now served essentially two terms on the Board.[4] Board Member Smith has been in an expired term for nearly two years. The Office of Inspector General ("OIG") has repeatedly found the Board has failed to provide adequate or effective oversight of the FCA during the time period where President Biden has failed to abide by the law mandating he appoint Board Members.

---

[4] Notwithstanding the fact that Board Members may not succeed themselves. 12 U.S.C. § 2242(b).

Implementation of the Act may be impossible, and is certainly impracticable, unless and until a fully-functional Board is appointed by the President. Although the President clearly has discretion to choose whom to appoint to the Board, he has no discretion to decide if a functional Board should or should not be constituted. The Farm Credit Act at § 2242(a) provides that "Members of the Board *shall* be appointed by the President". *See also McQueary v. Laird*, 449 F.2d 608, 611 (10th Cir. 1971) (mandamus will issue to require the exercise of permissible discretion, or to compel performance of ministerial duties).

No other federal agency, GSE, or private lender in this country enjoys the combination of near total insulation from oversight by *all three* branches of government and immunity from legal liability or recourse for outright violations of borrowers' rights. The potential for continued abuse of farmers and ranchers is exponential if the System is to police itself in enforcing borrowers' rights while the President refuses to provide its enforcer, the FCA, a fully-functional Board.

These appointments are absolutely imperative when it is the fox who is the sole guardian of the chicken coop.

## FACTUAL ALLEGATIONS

### I. Presidential Appointment of the FCA Board.

9. The Farm Credit Act of 1971 ("Act"), as amended, vests responsibility for managing the FCA in the FCA Board.

10.     The FCA Board is tasked with approving the policies, regulations, charters, and enforcement activities that ensure a strong Farm Credit System.

11.     The FCA Board also is to provide for the examination and supervision of the Farm Credit System and its institutions.

12.     The Board is to consist of three Presidentially Appointed, Senate-confirmed members who are broadly representative of the public interest, with no more than two being members of the same political party. 12 U.S.C. § 2242(a).[5]

13.     Board members serve in six-year terms, which are staggered and fixed so that a term expires every two years regardless of when the member was appointed. 12 U.S.C. § 2242(b).

14.     The Act provides for Board members to continue serving after expiration of their term until a successor is appointed and confirmed. *Id*.

15.     However, Board Members may not succeed themselves. 12 U.S.C. § 2242(b).

16.     The above notwithstanding, the FCA Board operated as a two-member body following the death of the Honorable Board Chairman Dallas P. Tonsager in May 2019 until October 3, 2022.

---

[5] As such, President Biden is required to appoint at least one Member who is not a member of the Democratic Party.

17. The resulting vacancy, which lasted over three years, was the longest since the current structure of the Board was established by the Farm Credit Amendments Act of 1985.

18. The Honorable Chairman Vincent G. Logan was appointed to the FCA Board by President Joe Biden on October 3, 2022.

19. On October 21, 2022, President Biden designated Chairman Logan as the Board Chairman and CEO.

20. Chairman Logan's term expires on May 21, 2026.

21. Chairman Logan is the only Board Member serving in an unexpired term.

22. The Honorable Jeffery S. Hall was appointed to the FCA Board by President Barack Obama on March 17, 2015.

23. Board Member Hall's term expired on October 13, 2018.

24. Board Member Hall has served for six years in an expired term and will continue to do so until the President names his successor.

25. The six-year continuation of Board Member Hall's service after the end of his term in 2018 is the longest in FCA history.

26. The Honorable Glen R. Smith was appointed to the FCA Board by President Donald Trump on December 8, 2017.

27. Board Member Smith formerly served as the Board Chairman and CEO when he was designated as such by President Donald Trump on July 17, 2019.

28.    Board Member Smith's term expired on May 21, 2022.

29.    Board Member Smith has served for nearly two years in an expired term and will continue to do so until the President names his successor.

## II.    The Problems Created by Board Members in Holdover Status.

30.    The continued service of Board Members Smith and Hall – both of whose terms have expired – is inadequate and ineffective, harming the FCA and System.

31.    Board Members in such a 'holdover' status may face uncertainty as to the length of their continued service, which is dependent upon appointment of their successor by the President.

32.    This uncertainty – which Board policy has attempted to mitigate in part by allowing certain holdover Members to perform their official duties outside the Washington, D.C. area – makes the guarantee of a quorum even more tenuous.

33.    Without a quorum, a single-member Board is unable to establish general policy or promulgate rules and regulations, leaving the FCA unable to carry out its proscribed statutory obligations and duties.

34.    Moreover, extended holdover positions have the potential to undermine the independent status of the FCA, as a Board Member without a fixed term is, quite obviously, more vulnerable to the vagaries of politics.

35. A Board Member in holdover status may change his or her duty station from FCA headquarters, with the Board Member being reimbursed for regularly scheduled official travel to headquarters. FCA-PS-64.

36. Additionally, holdover Board Members who change their duty station will be reimbursed by the FCA for travel and transportation expenses incurred in connection with relocation to their new duty station. *Id.*

37. While the FCA will not ordinarily reimburse Board Members for lodging in the metropolitan Washington, D.C. area, it will do so if they have relocated outside the area in a holdover status. *Id.*

38. In addition to the logistical nightmare arising from Board Members in a holdover status changing his or her duty station, this results in increased reimbursed travel expenses for the FCA.

39. It also results in the inability of the Board to effectively execute its oversight.

40. According to a representative of Board Member Smith's company, Smith Land Service Co., Board Member Smith has exercised his option to relocate to Iowa while in holdover status.

41. Upon information and belief, Board Member Hall has exercised his option to relocate to Kentucky and/or Indiana while in holdover status.

42. Travel and transportation expenses increased by 80.6%, or from $2,441,070 to $3,029,833 from FY 2017 to FY 2018.

43. Travel and transportation expenses increased by 94.4%, or from $1,227,308 to $2,386,317 from FY 2022 to FY 2023.

### III. An Absent, Partial Board Cannot Effectively or Adequately Oversee the FCA.

44. In October 2022, the FCA's Office of Inspector General ("OIG") said one of the most serious management and performance challenges facing the FCA is "Operating with Less than an Ideal Board Member Composition."

45. In the OIG's Management Challenges Report from October 2022, it also said the "FCA faces another challenge in operating for an extended period of time with less than a full complement of the Board in non-expired terms".

46. The OIG acknowledged that this challenge is outside the FCA's power to address, as Board Members are uniquely subject to Presidential appointment and Senate confirmation.

47. The Board is responsible for overseeing and ensuring the efficiency and adequacy of all offices within the FCA.

### A. Office of Examination Audit

48. The Office of Examination ("OE") is responsible for examining and supervising System institutions in accordance with the Farm Credit Act of 1971, as amended, and applicable regulations.

49.     The OE has oversight responsibility for the System's 58 agricultural credit associations, 4 banks, 1 federal land credit association, and 6 service corporations.[6]

50.     The Office of Congressional and Public Affairs ("OCPA"), which handles complaints from borrowers, is within the OE.

51.     The OCPA internal procedures manual, including internal procedures for borrower complaints, remains in draft format. FCA OIG Inspection Report I-22-01: Farm Credit Administration's External Communication Process (Aug. 2, 2022).

52.     Nonetheless, the FCA published Examination Manual EM-33.2 in 2017 to provide OE examiners guidance regarding examination of a System institution's compliance with borrower rights-related regulations and laws.

53.     EM-33.2 says "Institutions that do not appropriately provide borrower rights may be exposed to paying fines and damages, receiving a distressed loan restructuring directive, voiding of contracts, and incurring reputations risks. As such, effective internal controls are important to ensure compliance with borrower rights regulations."

54.     It further directs examiners to determine whether institutions have sufficient processes and internal controls in place to enable its directors, employees, and agents to understand and comply with requirements on borrowers' rights.

---

[6] As of July 1, 2023.

55.     As noted in FCA's Board Policy Statement 53, *Examination Philosophy*, the OE must maintain staff resources to fulfill the FCA's mission.[7]

56.     Because examiners are an essential link with System institutions through examination and oversight, it is imperative for the FCA to have a trained and developed examination talent pool to perform the work.

57.     The OE hires more new staff each year than any other office at FCA.

58.     The OE has a high rate of attrition.

59.     The OE primarily uses its existing examiner staff to recruit for new examiner positions.

60.     The OE generally sends 2 to 3 people to recruit at each location for campus recruiting.

61.     The OE attends about 20 events each year.

62.     The OE allocates important staff time and financial resources to recruiting activities, taking resources away from its more critical task of ensuring compliance of System institutions with applicable laws and regulations.

63.     The OE's summaries show that for FY 2019 recruiting efforts, 242 staff days were used, with travel expenses totaling $31,370.

---

[7] FCA's mission "is to ensure that Farm Credit System institutions and Farmer Mac are safe, sound, and dependable sources of credit and related services for all creditworthy and eligible persons in agriculture and rural America."

64.     The OE's summaries show that for FY 2020 recruiting efforts, 248 staff days were used, with travel expenses totaling $30,095.

65.     The OE's summaries show that for FY 2021 recruiting efforts, 164 staff days were used with $0 in travel expenses.[8]

66.     The OIG found that while the OE plans for and allocates substantial resources to examiner recruiting efforts, there is a lack of a cost / benefit analysis on whether the efforts and strategies are effective.

67.     The OIG found that, notwithstanding the significant amount of OE staff time and financial resources devoted to recruiting efforts, the OE still has significant staffing needs, especially for examiner and specialist positions.

68.     In 2019, the Office of Information Technology ("OIT") developed software for the OE to provide real-time information about staffing availability.

69.     The OE is directed to prioritize examination activities based on statutory compliance dates and institution risk when scheduling staff.

70.     Although the OE developed a scheduling process, it is not even fully documented. FCA OIG Inspection Report A-22-03: Farm Credit Administration's Examiner Staffing Program (Jan. 30, 2023).

71.     OE Directive 48, *Scheduling*, documents guidance on scheduling examinations and projects.

---

[8] Presumably, due to COVID-19 travel restrictions.

72. However, OE Directive 48 does not even reference the web-based scheduling tool and includes outdated roles and responsibilities for division schedulers.

73. The OIG found that, because OE Directive 48 had not been updated in ten years, the directive also did not fully address the OE's current scheduling processes.

74. The OIG found that scheduling practices and staffing data are essential to maintaining an effective oversight program.

B. <u>Office of Examination and Office of General Counsel Audit</u>

75. The OE and Office of General Counsel ("OGC") are responsible for responding to reports of suspected criminal activity.

76. The OIG said: "Because of FCA's role as a regulator, it is important that strong practices are initiated to protect data and educate and aid institutions in responding to criminal activity that jeopardizes the safety and soundness of the System."

77. The OIG found that the "FCA needs to improve the internal handling and storage of criminal referrals. System institutions must file criminal referrals with law enforcement agencies and FCA when there is known or suspected criminal activity. However, there is limited documentation on FCA's handling of the information once received. The OE and OGC need to clarify handling on criminal procedures in documented procedures." FCA OIG Audit Report A-19-03: Farm Credit Administration's Criminal Referral Process (Mar. 12, 2020).

78.    The OIG also found the OGC's internal policies and procedures have not been updated to account for substantial changes made to the criminal referral process.

79.    The OIG found: "For example, the EDGe system and the electronic portal are not addressed in the OGC policies. The current policies state that the administrative assistant hand delivers criminal referrals to the responsible attorney to maintain confidentiality. The policies then state the attorney logs the criminal referral in, maintains the FCA criminal referral forms, reviews them for trends, and forwards them to OE and the Inspector General. These policies are currently not followed. At this time, the forms are not hand delivered, the criminal referral forms are maintained in SharePoint since 2014, and the forms are not forwarded to the Inspector General. OGC policies do not address the portal or current processes such as moving certain criminal referrals to a more restricted area in EDGe if the form contains certain sensitive information."

80.    The OIG further found: "In OE, there are several individuals performing certain tasks relating to criminal referrals, but those processes are not documented. For example, there are individuals in RSD that review criminal referrals for concerns to an individual institution, systemic information that could affect the overall safety and soundness of the System, and items that may warrant supervisory or enforcement actions. The process was initiated about two years ago, but there are no procedures documenting the RSD review or how the process works. OE also has a

financial analyst that maintains a log of criminal referrals. The analyst reviews certain referral information and creates a log by fiscal year (FY). This individual stated a quarterly report is given to the Chief Examiner and a limited group of OE managers; however, this process is also not documented. It is important for OE to document what types of reviews are done relating to the criminal referrals and who is responsible for specific tasks."

81. In addition, the OIG found the FCA has issued limited formal guidance to the System on criminal referrals.

82. From 2015-2020, the FCA worked on clarification guidance for the criminal referral regulations.

83. As of the OIG's 2020 Audit, that draft guidance was formatted as a frequently asked questions document clarifying the FCA's process and expectations regarding criminal referrals.

84. However, the OIG found that, as of the 2020 Audit, the document remained in draft form and had not yet been approved for release.

C. Office of Data Analytics and Economics Audit

85. On November 19, 2019, the FCA Board approved the creation of the Office of Data Analytics and Economics ("ODAE").

86.    The FCA Board then named a Chief Data Officer ("CDO") to serve as a steward for FCA data and as a provider of information for objective, evidence-based decision making across the FCA.

87.    From 2020 to 2024, the ODAE's staff has more than doubled, and its budget has increased by nearly 60%.

88.    The ODAE has an annual budget of around $3 million.

89.    Salaries and expenses are the largest expense in the ODAE's budget.

90.    In 2022, the ODAE spent $2,111,519 of $2,350,470 (or 89.8%) of its expenditures on Salaries and Benefits.

91.    The OIG completed an audit of the ODAE in 2023. FCA OIG Audit Report A-23-01: Farm Credit Administration's Office of Data Analytics and Economics (June 14, 2013).

92.    The OIG found that: a) "Although the Agency has devoted resources to the new office, ODAE has not established important control mechanisms to improve the effectiveness of the office"; b) "the Agency does not have overarching policies and procedures on ODAE's roles and responsibilities, reporting requirements, and coordination with other FCA offices"; c) "ODAE also focused on other priorities, including… tasks assigned by senior leadership and the FCA Board"; and d) "While ODAE has several written policies and procedures that explain technical aspects of

its work, these documents were generally in draft form and were not completed in a specific, detailed, and consistent manner".

93.     The OIG also said "ODAE officials explained that prior to the start of the current FCA Chairman's term, ODAE met with the FCA Board Members and the FCA Chief Operating Officer ("COO") on a monthly basis. At these meetings, ODAE would provide updates on its current projects, receive input on future projects, and discuss Board priorities. . . the office lacks overarching policy direction, such as the type of direction that would be included in an FCA Board policy statement or an Agency-wide policy or procedure."

94.     The OIG found that the monthly meetings of ODAE leadership, the COO, and the FCA Board no longer occur.

95.     The OIG further said, "As previously noted, ODAE has a number of recurring projects that are required by law or by FCA leadership. These projects include the Evidence Act report, quarterly economic briefings to the FCA Board, and YBS reporting. While ODAE's main functions are acknowledged in FCA Regulation 600 (subpart A), there are currently no Agency-wide policies outlining the office's reporting requirement to the Board or senior leadership, or how ODAE will coordinate with other FCA offices."

96.     The OIG also further said, "Since the creation of the ODAE in late 2019, FCA has invested significant resources in its operations. Over the three plus years of its

existence, ODAE's budget and staff both have significantly increased. Thus, it is vital that the Agency further define ODAE's responsibilities so that the office operates in an effective and efficient manner. By not updating policies and procedures to explain the responsibilities of ODAE and how it can best work with other FCA offices, important requirements and milestones are at risk of not being met and other FCA offices are at risk of having to undertake or duplicate ODAE's responsibilities."

97.    In his response to the OIG's report on June 6, 2023, Chairman Logan said "a strong framework of internal controls remains critical" and the "FCA leadership agrees to take corrective actions to address recommendations 1 and 2 identified by the OIG in this audit".

98.    Recommendation 1 included the FCA developing policies and procedures for the ODAE, including the office's roles and responsibilities, reporting requirements, and coordination with other FCA offices.

99.    The FCA established the Data Advisory Group ("DAG") to be the principal internal forum for addressing data management standards, priorities, policies, and practices.

100.   The DAG charter states that membership includes: 1) Chief Data Officer, who serves as Chair, from ODAE; 2) Chief Information Officer or designee; 3) Senior Agency Official for Privacy or designee; 4) Senior Agency Official for Records

Management or designee; 5) Representative from Office of Examination; 6) Representative from Office of Regulatory Policy; 7) Representative from Office of General Counsel; 8) Representative from Office of the Chief Financial Officer; 9) Representative from Office of Agency Services; 10) Representative from Office of Congressional and Public Affairs; and 11) Representative from Office of Secondary Market Oversight.

101. In its 2023 audit, the OIG found there was Agency uncertainty regarding the participation in, and function of, the DAG among FCA offices. FCA OIG Audit Report A-23-01: Farm Credit Administration's Office of Data Analytics and Economics (June 14, 2023).

102. For example, the OIG said FCA officials stated they were unaware their office had a position on the DAG, even though it was clearly identified in the charter.

103. The OIG also found that neither the DAG nor the four subcommittees (the Call Report Data Group, the Technical Capabilities and Platform Group, the Data Governance and Management Group, and the Loans Data Group) had written procedures on how to exercise and document decision-making and recommendation authorities, such as voting procedures and meeting note requirements.

104. During testing, the OIG found that meeting records from DAG meetings did not contain evidence of what occurred at DAG meetings or properly memorialize DAG decisions.

105.   The FCA's Office of Management and Budget ("OMB") requires a major rule analysis for every proposed rule the FCA issues.

106.   In accordance with the requirements set forth in the Congressional Review Act, OMB Memorandum M-19-14, OMC Circular A-4 and additional federal guidance and authorities, a rule is considered a "major rule" based on the concept that the rule has resulted in or is likely to result in:

(A) an annual effect on the economy of $100,000,000 or more;

(B) a major increase in costs or prices for consumer, individual industries, federal, state, or local government agencies, or geographic regions; or

(C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

107.   The OIG found the FCA only conducted one analysis from November 2019 through September 2022.

108.   At the time of the OIG's audit, the FCA's Office of Regulatory Policy was no longer staffed with economists and instead relied on the ODAE to support its rulemaking responsibilities and to perform analyses on proposed rules.

109.   An ODAE official informed the OIG during the audit that, based on the Fall 2022 Unified Agenda, the office planned to participate in the analysis on eight rules, four in FY 2023 and four in FY 2024.

110. However, as of February 2023, or five months into the fiscal year, the ODAE had not conducted an economic impact analysis on any of the four proposed rules scheduled for FY 2023.

111. The OIG found the ODAE's internal procedures are silent on what factors it uses to decide whether or not an analysis will be conducted or what justifications are required for reaching the decision.

112. ODAE and ORP officials also stated the CDO and ORP leadership meet periodically to discuss the FCA Board's Unified Agenda, but it is solely up to the ODAE whether they conduct a regulatory economic impact analysis, with no justification provided for reaching its determination.

113. The OIG said one of the root causes is the "lack of a defined overarching [FCA] policy outlining ODAE's responsibilities and requirements" and the fact that the "ODAE's internal procedures, many of which remain in draft, lack detail and consistency, and were not prioritized."

114. The OIG found there were currently no office wide policies outlining the ODAE's reporting requirements to the Board or senior leadership, or how ODAE will coordinate with other FCA offices.

115. The FCA Board has failed to provide effective, or even adequate, oversight of the offices of the Farm Credit Administration.

116. This is due to not having a functional Board.

117. This is also because the majority of the Board is in holdover status due to President Biden's refusal to appoint Board Members to replace those serving in expired terms.

### IV. The Board's Inability to Effectively or Adequately Oversee the Administration Allowed a System Institution to Go Rogue.

118. In July 2020, Mr. Kittle became a borrower and stockholder in Alabama Farm Credit, ACA ("AFC").

119. AFC is a System institution within the Farm Credit System under Charter No. 8084, issued by the Administration on January 4, 2010.

120. In July 2021, while working towards a refinance with AFC, Mr. Kittle discovered inconsistencies which raised concerns over AFC's handling of his initial loans, as well as the pending refinance.

121. Upon raising those concerns to his branch manager, Amanda Simpson, she said: "Your payment history and account is in excellent standing with AFC and we look forward to working to meet your credit needs. I am sorry for the misunderstanding".

122. On July 23, 2021, Mr. Kittle requested copies of his loan file with AFC.

123. AFC subsequently placed its Chief Risk Officer, Jody Campbell, over Mr. Kittle's account before providing Mr. Kittle his loan documents on July 28, 2021.

124. On July 30, 2021 AFC asked whether Mr. Kittle would be available for a call with its attorney, Chris Glenos ("Mr. Glenos") of the Bradley Arant Boult Cummings, LLP law firm ("Bradley").[9]

125. "AFC retained Bradley [and Mr. Glenos] to represent it on or about July 26, 2021, after [Mr. Kittle] began challenging AFC's handling of [his] request to modify certain loans, and threatening legal action." Exhibit A.

126. After Mr. Glenos became involved, Mr. Kittle was precluded from ever speaking with AFC again.

127. In order to conduct routine banking matters, such as balance inquiries, payment history, requesting pay-off letters, submitting credit requests, or accessing his online banking account, Mr. Kittle had to speak exclusively to Mr. Glenos.

128. Mr. Glenos subsequently began an egregious campaign of retaliation against Mr. Kittle and caused AFC to violate federal laws and regulations, including the Farm Credit Act and the Equal Credit Opportunity Act.

## V. A System Institution's Private Attorney Retaliates Against a Borrower for Complaining of Violations of His Rights as a Borrower.

129. For example, on August 12, 2021, Mr. Glenos caused AFC to violate the Act by refusing to provide Mr. Kittle appraisals of his property, saying "[a]ppraisals ordered and paid for by AFC are the property of AFC." Exhibit C.

---

[9] Bradley is a national law firm based in Birmingham, Alabama. It has 13 offices in 8 states with more than 650 lawyers. It is one of the nation's 250 largest law firms.

130.   On August 16, 2021, Mr. Glenos caused AFC to violate the Act by informing Mr. Kittle that AFC had no obligation to provide Mr. Kittle with a) AFC's Articles of Incorporation; b) AFC's Bylaws; or c) appraisals for Mr. Kittle's collateral unless Mr. Kittle would sign a release of legal claims. Exhibit C.

131.   In addition to this being a violation of numerous other regulations and laws under the Act, pursuant to 12 C.F.R. § 617.7010, "[a Farm Credit System] lender may not obtain a waiver of borrower rights".

132.   On August 20, 2021, Mr. Glenos caused AFC to violate the Act by saying, "I have advised AFC not to accept any new credit applications from [the Kittle Borrowers] while they are threatening or pursuing litigation claims against AFC." Exhibit C.

133.   On October 6, 2021, Mr. Glenos caused AFC to violate the Act by saying, "[a]s explained previously, AFC is not in a position to accept any new loan applications for the Kittle Borrowers at this time. This is due, without limitation, to the unresolved legal claims the Kittle Borrowers have asserted and continue to assert against AFC". Exhibit C.

134.   On October 26, 2021, Mr. Glenos caused AFC to violate the Act, saying "For reasons previously communicated, AFC is unwilling to entertain any such proposal to deviate from the parties existing agreements that does not include a release of the borrowers' disputed claims against AFC and its employees". Exhibit C.

135. Mr. Glenos then proceeded to say, "here are the non binding terms that AFC would be willing to consider agreeing to pursuant to a restructure agreement 1) All Kittle parties execute a full release and covenant not to sue i[n] favor of AFC and AFC's officers, directors, employees and counsel… 7. Upon repayment, Dustin Kittle's $1,000 stock in the cooperative will be refunded and he will no longer be an AFC customer/stockholder. 8. Kittle parties acknowledge that no further renewals, advances, extensions or credit of any kind will be granted by AFC to the Kittle parties." Exhibit C.

136. On October 29, 2021, Mr. Glenos caused AFC to violate the Act by saying, "[a]s explained in my letter of August 20, 2021, AFC is unwilling to accept any new applications from the Kittle borrowers at this time due to the unresolved and disputed claims being threatened by the Kittle borrowers."[10] Exhibit C.

137. On November 8, 2021, Mr. Kittle forwarded AFC's Officers and Directors correspondence reporting Mr. Glenos to the Tennessee Board of Professional Responsibility for his professional misconduct while representing AFC.

138. Also on November 8, 2021, Mr. Glenos, caused AFC to violate the Act by saying, in a recorded call, AFC would not accept any credit applications or provide loan servicing with respect to Mr. Kittle loans with AFC unless Mr. Kittle would

---

[10] It should be noted that Mr. Kittle has never filed a lawsuit against AFC; in fact, this is the first Complaint he has ever filed as a named party.

sign a release of legal claims in favor of AFC, its Officers, its Directors, its employees, Mr. Glenos, and the Bradley law firm.

139. In that same call, Mr. Kittle informed Mr. Glenos that a) the distressed notice would be improper; b) he had sufficient capital to meet his loan obligations; b) he had never missed or so much as been late on a loan payment; c) Mr. Glenos was engaging in criminal extortion; and d) the call was being recorded.

140. Hours later, Mr. Glenos, on behalf of AFC, placed Mr. Kittle's loans in distress with the potential of foreclosure within 45 days despite Mr. Kittle never having missed a single payment in the history of his loans with AFC.

141. Also on that same day, November 8, 2021, a partner at Bradley informed AFC that a conflict of interest between the firm and AFC had arisen and requested AFC provide its consent to the conflict. Exhibit D.[11] [12]

142. Specifically, Bradley told AFC that the "firm's further work on an existing matter, including, without limitation, potentially litigating issues arising from that firm's prior legal work, may generate a conflict of interest under the rule when there is a plausible claim that the prior work was deficient, especially if there are

_____

[11] Exhibit D includes Mr. Kittle's and his attorney's Motion to Disqualify AFC's counsel in a separate action, including the conflict consent. As evidenced in this Exhibit, Bradley had AFC CEO Mel Koller consent to the conflict on behalf of AFC. Mr. Koller is, or was, also represented by Bradley in his individual capacity and in his official capacity as AFC CEO.
[12] Filed under seal in the separate action as parts contain discussions regarding AFC's Counsel's professional misconduct, which AFC's Counsel claims are subject to confidentiality... Portions containing information purportedly covered by AFC's right to confidentiality are redacted in an abundance of caution.

alternative strategies for handling the matter, and one is better for the law firm and another is better for the client." Exhibit D.

143.   Bradley explained that "[i]n such an instance, the potential exists that the law firm will pursue the strategy that is better for the firm so as to protect its prior work from blame" and that "[i]n this situation, **it could be argued that the allegations made by Dustin Kittle regarding the legal services provided by our firm may result in us pursuing a settlement that would reduce the likelihood of Mr. Kittle pursuing some type of claim against the firm**." Exhibit D (emphasis added).

144.   Bradley continued to say, "For example, **the firm could focus the new matter on a way to resolve the entire dispute and obtain from Mr. Kittle and Kittle Farms, LLC a release that benefits the firm and avoids criticism of the firm's interactions with Mr. Kittle**." Exhibit D (emphasis added).

145.   To avoid his farm and home being wrongfully foreclosed on for his refusal to sign a release of legal claims in favor of AFC, its Officers, its Directors, its employees, Mr. Glenos, and the Bradley law firm in order to receive loan servicing guaranteed him under federal law, including the Act, Mr. Kittle was forced to pay off his loans 20 years early.

146.   In order to do so, Mr. Kittle had to liquidate his assets (including livestock, equipment, retirement accounts, etc.), obtain personal loans from friends and family,

sell a historic 100-acre farm he had purchased just months before, and obtain

financing (on significantly less favorable terms) through a non-Farm Credit lender.

147.  Mr. Kittle was ultimately forced to sell his family's home.

## VI.  **The FCA Patently Failed at its Job to Regulate or Correct its System Institution's Violations of Rights.**

148.  After the retaliation by Mr. Glenos and AFC began, Mr. Kittle had submitted

a complaint to the FCA for violations of his rights as a borrower under the Act.

149.  This complaint was submitted early on – August 24, 2021. Exhibit E.

150.  The FCA began its investigation of AFC on August 26, 2021. Exhibit E.

151.  The FCA informed Mr. Kittle that it would "strive to provide a response

within 60 days" and that if it were unable to finish its review in 60 days, it would

notify him of the same and provide him with information on the status of its review.

Exhibit E.

152.  The FCA further informed Mr. Kittle that, while "the law does not allow [it]

to function as a consumer advocacy bureau" and it does not "adjudicate disputes

between System institutions and borrowers" and it has "no authority to provide

monetary relief", if it finds that a violation has occurred, "[it would] use [its]

examination and enforcement authorities to require corrective action." Exhibit E.

153.  On October 26, 2021, the OCPA sent Mr. Kittle a letter saying it was "still

reviewing [his] concerns", its "goal was to complete [its] review within 60 days of

receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." Exhibit E.

154.   Mr. Kittle responded to the OCPA that same day, saying "things have taken a turn for the worse", "[AFC is] attempting to coerce me into signing a release of claims against them", "I don't want to do it but they have blocked all my requests for credit outright", and "**It's retaliation, it's fraud, and it's coercion – and I really need your help**." Exhibit E (emphasis added).

155.   On October 30, 2021, Mr. Kittle explained, "Mr. Glenos recently sent us a letter stating that he unilaterally ordered our farm credit lending institution to not consider any attempts at credit, now or in the future, unless we sign a full release of claims. **That is a blatant violation of the Farm Credit Act and almost every equal lending statute in the country**." Exhibit E (emphasis added).

156.   Mr. Kittle further explained that, "A private lawyer has no authority to deny credit allowed to us under the Farm Credit Act… we have suffered significant financial harm and distress in having to conduct our banking under the U.S. Farm Credit Act with a law firm who is intent on pushing us out of the U.S. Farm Credit System. We have dealt with this since July". Exhibit E.

157.   On November 3, 2021, Mr. Kittle forwarded to the OCPA additional documentation demonstrating obvious violations of the Act that had occurred since his initial complaint in August. Exhibit E.

158.   That same day, Mr. Kittle also provided the OCPA with documentation that AFC's CEO had been notified of the violations and failed to act.  Exhibit E.

159.   On November 5, 2021, Mr. Kittle forwarded the OCPA a recorded call of Mr. Glenos saying AFC would do "anything reasonable" on Mr. Kittle's loans if he would just sign a release of legal claims in favor of AFC, and the Bradley law firm. Exhibit E.

160.   In that same correspondence, Mr. Kittle said: "**The United States Farm Credit Administration is currently on notice of and has been for more than 60 days now [of] an active effort to extort a borrower into signing a full release of their federal rights under the US Farm Credit Act just so that lending institution and its attorneys can have their wrongful acts protected – and the payoff for that borrower is to be able to obtain credit again through the US Farm Credit System. This agency is currently allowing this to happen, as they have been placed on notice of same and have failed to take any corrective action whatsoever**." Exhibit E (emphasis added).

161.   Also in that same correspondence, Mr. Kittle requested the recording and email be forwarded to the FCA's Director and General Counsel. Exhibit E.

162.   Also in that same correspondence, Mr. Kittle informed the OCPA that "this private attorney has place[d] the subject loans in distressed status and provided notice of same despite the fact the borrowers have never missed or even been late on

a payment – and despite the fact they have a current loan to value at or near 50% with more than $4 million in appraised real property equity and livestock assets they own free and clear… These borrowers have had their ability to obtain credit frozen by a private attorney as well as their lending institution… for the past 100 days." Exhibit E.

163. On November 8, 2021, Mr. Kittle forwarded the OCPA correspondence reporting Mr. Glenos to the Tennessee Board of Professional Responsibility for "hijack[ing] our borrower-lender relationship for the past 100 days."

164. Later that night, Mr. Kittle forwarded to the OCPA Mr. Glenos's correspondence placing Mr. Kittle's loans in distress with the threat of foreclosure, explaining that "[his] loans were just placed in distress by this rogue attorney trying to commit extortion – he emailed us the letter from Alabama Farm Credit letterhead. **Someone up there needs to wake up and help us – and quickly – this is serious**." Exhibit E (emphasis added).

165. Also that night, Mr. Kittle requested the OCPA "assist [him] in being able to conduct [his] business with [its] lending institution" and explained "**I need help in just being able to talk with my bank, which I have had no communication with since on or about July 30th… These institutions are clearly violating the Farm Credit Act and are causing me financial harm… please help me get this finalized or some relief soon**." Exhibit E (emphasis added).

166.   On November 10, 2021, after receiving no response to his pleas for help, Mr. Kittle asked the OCPA for an update. Exhibit E.

167.   Also on November 10, 2021, Mr. Kittle informed the OCPA that he spoke with AFC's Chairman of the Board of Directors who said he was powerless to stop it and that he had been told to answer to two people, the CEO Mel Koller and CRO Jody Campbell. Exhibit E.

168.   In this same correspondence, Mr. Kittle told the OCPA to "**do your job and do it now** – you are allowing innocent borrowers to be extorted and to have their properties foreclosed on when they have never missed a payment. **You have had notice of this for months and you have done nothing to stop it** – please accept this correspondence as notice that **the US Farm Credit Administration has caused harm in their lack of response to violations by a lending institution under its watch. There is additional harm being allowed to occur now that could be stopped if this Administration would simply direct this institution to comply with the Farm Credit Act** by allowing borrowers to conduct their banking business and to communicate with their bank without the impediment of contacting a private law firm in Birmingham, Alabama to even check the balance of their account. The delay in a response by the FCA has resulted in a wrongful foreclosure being initiated against borrowers – by a private law firm – and the exercise of rights afforded under the US. Farm Credit Act have been conditioned on the release of legal claims for

retaliation in reporting violating of that same Act. It is time for this Director to take action – your borrowers are being extorted and you are meeting about it once a week every Tuesday like you had someone report that they didn't get correct change back… History will not look kindly on this Administration's delay and inaction on a file they received months ago and refused to even enter into a 3-way call on to tell the lending institution to communicate with the borrowers. Please also forward this to legal. If there is any other independent or governmental body who can [step] in to stop this corruption, send it to them as well." Exhibit E (emphasis added).

169.   The following day, the OCPA responded to Mr. Kittle's email thanking him for the update, explained they were reviewing his concerns, that "[they] understand the seriousness of the situation and are making every effort to thoroughly investigate the matters". Exhibit E.

170.   The OCPA proceeded to explain: "[they] do ensure that System institutions operate in a safe and sound manner and that they do comply with applicable laws and regulations", that "the law does not allow [them] to mediate disputes between System institutions and borrowers", but "[i]f an institution has violated a law or regulation, [they] will use [their] enforcement authorities to require the institution to take correction actions. [They] appreciate [him] keeping [them] informed and will provide periodic updates on the status of [their] review." Exhibit E.

171.   Mr. Kittle responded that he was considering signing the release, as "[he is] at the end of [his] rope and [doesn't] want to risk losing [his] farm to a wrongful foreclosure with no end to this in sight". Exhibit E.

172.   On November 12, 2021, the OCPA informed Mr. Kittle it "cannot provide advice on the matters raised in [his] complaint" and "[w]hether [he] sign[s] a release of claims is [his] decision." Exhibit E.

173.   Mr. Kittle responded saying if he signed a release, he would be precluded from speaking with the OCPA about his complaint "**but, based on the fact we are 90 days in with no effort to have your lending institution correct the violations, I have a strong feeling that is exactly what the FCA wants… The effort by this office is a disservice to the agricultural borrowers who depend on this Administration**." Exhibit E (emphasis added).

174.   Due to the FCA's complete and utter failure to use its examination and enforcement authorities to require corrective action, Mr. Kittle was forced to pay off his loans with AFC on December 1, 2021 to avoid the wrongful foreclosure.

175.   On January 6, 2022, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." Exhibit E.

176. On March 7, 2022, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." Exhibit E.

177. On July 26, 2022, Mr. Kittle emailed the OCPA asking for an update on the investigation. Exhibit E.

178. On July 28, 2022, the OCPA responded saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." Exhibit E.

179. On September 28, 2022, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." Exhibit E.

180. On December 1, 2022, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." Exhibit E.

181. On January 26, 2023, Mr. Kittle submitted a request to the FCA OIG for review of his complaint with the OCPA. Exhibit E.

182.   In his request, he explained, "In August 2021… [o]ur claim was assigned to Investigator Russell Middleton, who participated in an hour plus long telephone call with me days after the complaint was made. Since that time, I have reported and provided documented evidence of [numerous violations] to Investigator Middleton and the FCA… The Farm Credit Administration was informed of the time-sensitive nature of my complaint and the potential for irreparable harm but, remarkably, failed to take any action whatsoever. Instead, even now 18 months after the complaint was first made, I continue to receive boiler-plate correspondence from Investigator Middleton every few months informing me that, due to the complexities of our complaint, the investigation has not yet concluded. **In short, my family lost our home because the Farm Credit Administration failed us.** We provided concrete and documented evidence showing that the Farm Credit Lender was engaging in illegal acts under the Farm Credit Act, and potentially even criminal law, but could not get so much as a response to that complaint that allowed us to evaluate our other options. **I am seeking answers as to how this happened**." Exhibit E (emphasis added).

183.   On February 3, 2023, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." Exhibit E.

184.   Mr. Kittle forwarded this correspondence to the FCA OIG, who responded for the first time, acknowledging his January 26th request and saying it was "in the process of reviewing the details of [Mr Kittle's] complaint and FCA's actions in response to [his] August 2021 complaint." Exhibit E.

185.   On February 6, 2023, Mr. Kittle submitted a request for the records of the FCA's investigation into his August 2021 complaint pursuant to the Freedom of Information Act, pre-approving charges up to $500.00. Exhibit E.

186.   On February 14, 2023, FCA FOIA Public Liaison Jacqueline Baker responded to the request, saying that a) the FCA would charge for manual searches for records and review, as well as the pro-rated cost of the salary of the employees doing the work; b) the FCA found 170 potentially responsive documents that would require manual review and processing; c) the FCA anticipates this taking approximately 14.5 hours; d) the FCA anticipates the cost of processing these documents to be $1,345; e) Mr. Kittle would need to pay the $1,345 estimated fees in advance since he has no prior history of paying FOIA fees; and f) "since [they] are requiring advanced payment, [they] will not consider [his] request to be received and will not respond to it until [he] meets this requirement." Exhibit E.

187.   The FCA FOIA Liaison proceeded to say that "a number of the 170 potentially responsive documents will be subject to multiple FOIA exemptions" and "will most

likely be exempt from mandatory disclosure in their entirety under the bank examination privilege." Exhibit E.

188.  On April 3, 2023, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." Exhibit E.

189.  Mr. Kittle responded asking "**Can you advise as to whether one of these investigations has ever concluded? Or is it your practice to simply send out these letters indicating that more time is needed until it goes away? This involves an individual claim and a single financial institution – you are now going on two years without so much as one substantive update. This is a complete sham, and you all should be ashamed of what you have allowed to happen. I hope nothing like this ever befalls your own families**." Exhibit E (emphasis added).

190.  On April 6, 2023, Mr. Kittle requested an update from FCA OIG. Exhibit E.

191.  On April 12, 2023, the FCA OIG responded to Mr. Kittle's April 6th request saying they would "be sending a status update in the next day or so." Exhibit E.

192.  On April 13, 2023, the FCA OIG said they "[had] reviewed [the] January 26, 2023 complaint regarding the Agency's review of [his] August 24, 2021 borrower complaint. We interviewed staff from the Office of Congressional and Public Affairs

(OCPA) and the Office of Examination tasked with undertaking the borrower complaint review. We independently reviewed written documentation to substantiate the process followed by the Agency. Multiple offices within FCA are involved in the review and analysis. Based on our review, we found that the agency is still in the process of reviewing your borrower complaint. **FCA policy establishes a general expectation that borrower complaints receive a final response within 60 days**, though notes that this timeframe is a goal, with response times depending on, among other things, the complexity of the complaint and the need to obtain additional information from the complainant or institution. If the agency's review cannot be completed within 60 days, OCPA will periodically send a standard status letter to the complainant until the review is completed and a final response letter is sent. Notwithstanding the boilerplate nature of the letters that you received from OCPA, the agency appears to be making progress on addressing your complaint. We will conduct periodic status reviews of your complaint and hold it open and pending until the Agency concludes its review." Exhibit E (emphasis added).

193.   On June 12, 2023, the OCPA sent Mr. Kittle a letter with the FCA's findings from his August 2021 complaint. Exhibit F.

194.   **It took 657 days for Mr. Kittle to receive any meaningful response from the OCPA or anyone at the FCA.**

195. The FCA ultimately found AFC, primarily through Mr. Glenos, had violated Mr. Kittle's rights under the Farm Credit Act and Equal Credit Opportunity Act, numerous times. Exhibit F.

196. Notwithstanding the numerous violations the FCA found, the OCPA's findings – 657 days after the fact – were now useless for Mr. Kittle.

197. There is no private cause of action available to Mr. Kittle for pursuing recourse for the numerous violations found by the FCA of his rights under the Act.

198. The OCPA is unable and unwilling to provide recourse, citing: "We are also aware that since you first wrote to us, you have paid off your loans with the association, thereby ending the lending relationship." Exhibit F.

199. Mr. Kittle's lending relationship ended because the OCPA took 657 days to do *anything*.

200. The OCPA found, at a minimum, the following violations:

   a. "[T]he association issued you a written adverse credit decision on August 20, 2021, citing both an incomplete application and a withdrawal of an application. However, the notice failed to specify whether it was issued in response to all three of your credit requests or only some of them… You exercised your [Credit Review Committee] rights and a meeting with the CRC was held on October 18, 2021… We confirmed the CRC considered the August 2021 line of credit application and the release of your mother's

property, but not the refinance request. The CRC written decision to uphold the association's denial of two of your credit requests was provided to you on October 27, 2021. A CRC decision on the refinance request was not made."[13]

b. "[T]he association did not notify you in writing of the date the [requested financial] information was needed or include a written statement advising you if the information was not received by that date, no further consideration would be given to the applications as is required by 12 CFR 1002.9(c)(2)… The failure to provide the information could impact future credit and servicing decisions, but failure to provide updated financials alone cannot be the sole reason for putting a loan in default status or foreclosing on a loan."

c. "You also objected to one appraisal referencing values as not being an arm's-length transaction. FCA regulation 614.4250(a)(1) requires associations to value collateral at the present market value. Further, FCA regulation 614.4200(b)(1) instructs institutions to base the LTV on the

---

[13] As of the time of this filing, a decision by AFC still has not been made on Mr. Kittle's pending refinance from August 2021. The refinance was imminent in July 2021 and had been pending for weeks as part of Mr. Kittle and his branch manager's plan to consolidate multiple loans into a single loan, allow Mr. Kittle to access his current equity, and lock-in historically low interest rates.

58

appraised value. Using the updated appraisals, your LTV would have been below the 75% LTV the association required."

d. "We further confirmed the association provided you the appraisals on the remaining real estate collateral at your request as required by FCA regulation 618.8325(b). Specifically, the association provided your attorney the appraisals on the New Highway 7 property and your mother's property on August 3, 2021, and the appraisals of the two Santa Fe Pike properties on August 18, 2021. The association treated the request as being limited to new appraisals. However, we noted your request for the appraisals was not limited to new appraisals. Therefore, the association should have also sent you the existing appraisal on the 1800 Gravel Hill property. We have addressed this with the association… Whether or not an institution charges an applicant or borrower for the cost of obtaining an appraisal is a business decision. It is, however, a borrower's right to a copy of those appraisals, a right not controlled by who pays for ordering any appraisal."

e. "You further informed us the association, through its legal counsel, conditioned certain credit transaction on obtaining a release of liability from you. Specifically, you asserted the association required you to release it from liability before considering your credit request to remove its lien

on your mother's property and before considering any restructuring request. The association acted improperly if it attempted to condition certain credit transactions on receipt of a liability waiver from you. This would be specifically prohibited if such a release were sought before providing statutory rights, such as loan servicing. We understand you did not sign a release of claims and in August 20, 2021, the association sent an adverse credit decision notice. Relatedly, you explained around the same time, the association said it would only consider your future credit requests if you released them from liability. Even without a current borrowing relationship, a lender may not refuse to accept a credit application. According to 12 CFR 1002.4(b), a creditor is prohibited from discouraging a person from making or pursuing a credit application."

f. "After you filed your complaint with us, the association identified your loan as distressed and, on November 8, 2021, sent you a distressed loan servicing (DLS) notice. On receipt of the DLS notice, you contacted us to express concern over your account being identified as distressed even though you had never missed a payment. You also objected to the association sending you a 45-day DLA notice warning you foreclosure would be pursued if you did not apply for servicing. The association identified your loans as "distressed" in accordance with FCA regulation

617.7000. The association determined you lacked the financial ability to repay your loans… After this determination, the association sent the DLS notice as required by FCA regulation 617.7410(a). However, FCA regulation 617.7410(a) indicates the non-foreclosure DLS notice would have been the appropriate notice to send instead of the 45-day notice since your account was current at the time." Exhibit F.

## VII.  The FCA is Failing, and Has Failed, System Borrowers.

201.  After receiving the FCA's determination, Mr. Kittle began sharing his experience and the failures of the System to protect borrowers on social media.[14]

202.  Mr. Kittle learned other AFC borrowers and System borrowers across the country are being subjected to violations of their rights under the Act.

203.  As a licensed attorney in Alabama and Tennessee, Mr. Kittle now represents multiple AFC stockholders whose rights have been violated.

204.  Mr. Kittle called upon AFC's Officers and Directors for a meeting of the stockholders to address the specific issues facing AFC's borrowers.

205.  For example, many of his clients are poultry farmers with concerns over AFC's handling of their voluntary advance conditional payments. Exhibit G.

206.  Upon him calling for a meeting of the stockholders, AFC sued Mr. Kittle in federal court, seeking to enjoin any meeting of AFC's stockholders and, rather

---

[14] *See e.g.,* facebook.com/profile.php?id=100092978197143 and @dustinkittle on X.

ironically, saying Kittle fabricated the OCPA's investigation and there were "no findings of wrongdoing by AFC." Exhibit G.[15]

207. When Kittle requested leave of court to file the OCPA's June 12th findings under seal, AFC voluntarily dismissed the action.

208. AFC has apparently hired no less than four law firms and a Public Relations firm since he first spoke up about his rights being violated in July 2021.

209. Nonetheless, Mr. Kittle continues to call-out the abuses against AFC's borrowers by it and its arsenal of attorneys. Exhibit H.

210. AFC, AFC's Officers, AFC's Directors and AFC's attorneys continue to retaliate against Mr. Kittle and his client-borrowers, and to violate the Farm Credit Act, as well as other laws and regulations – daily. Exhibit H.

211. In fact, the husband of AFC Director and Audit Committee Member, Elizabeth Spruell, has gone so far as to post a public death threat against Mr. Kittle. Exhibit I.

212. The FCA is continuing to allow AFC, AFC's Officers, AFC's Directors and AFC's attorneys to be in violation of 12 CFR §§ 612.2135, 612.2145, 612.2150, 612.2280 and 612.2303, without corrective action. Exhibit H.

---

[15] Filed under seal in the separate action as parts contain discussions regarding AFC's Counsel's professional misconduct, which AFC's Counsel claims are subject to confidentiality. Portions containing information purportedly covered by AFC's right to confidentiality are redacted in an abundance of caution.

213. These constant violations of the Act are permitted to continue due to President Biden's refusal to provide the FCA with a functional Board so that System institutions, including AFC and its attorneys, can be effectively regulated and the Act can be enforced.

## CLAIM FOR RELIEF

### Count One
### (Violation of the U.S. Constitution, art. II, § 3)

214. Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

215. The U.S. Constitution imposes upon the President a duty to "take Care that the Laws will be faithfully executed and shall Commission all the Officers of the United States." U.S. Const. art. II, § 3.

216. The law says the President **shall** appoint the Members of the Farm Credit Administration Board, by and with the advice and consent of the Senate. 12 U.S.C. § 2242(a).

217. President Biden has violated U.S. Const. art II, §3 by failing to comply with 12 U.S.C. § 2242.

WHEREFORE, Plaintiff requests the following relief:

a) A declaratory judgment pursuant to 28 U.S.C. § 2201 that President Biden is in violation of 12 U.S.C. § 2242;

b) An injunction requiring President Biden, within 60 days of the order, to appoint two Members to the Farm Credit Administration Board;

c) A writ of mandamus pursuant to 28 U.S.C. § 1651 directing President Biden, within 60 days of the order, to appoint two Members to the Farm Credit Administration Board;

d) Awarding the Plaintiff's attorney's fees and costs pursuant to 28 U.S.C. § 2412; and

e) For such other further relief as this Court may deem just and proper.

DATED: March 22, 2024.

Respectfully submitted,

/s/ Ashley M. Posey
Ashley M. Posey (BPR 037411)
Attorney for Plaintiff
**HUMBLE LAW, LLC**
2310 Santa Fe Pike
Columbia, Tennessee 38401
Telephone: (205) 358-3100
Email: ashley@humble.law

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL:**

Henry C. Leventis
United States Attorney
719 Church Street, Suite 3300
Nashville, Tennessee 37203

Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530-0001

**COURTESY COPY TO:**

United States Farm Credit Administration
1501 Farm Credit Drive
McLean, Virginia 22102-5090.