# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **DUSTIN J. KITTLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No.: 1:24-cv-00025 |
| | ) | |
| **JOSEPH R. BIDEN, JR**., in his official | ) | CHIEF JUDGE CAMPBELL |
| capacity as President of the United States | ) | |
| of America, the **FARM CREDIT** | ) | |
| **ADMINISTRATION**, a federal agency, | ) | |
| **JEFFERY S. HALL**, as Chairman of | ) | |
| the Farm Credit Administration, and | ) | |
| **WENDY R. LAGUARDA**, as Inspector | ) | |
| General of the Farm Credit Administration, | ) | |
| | ) | |
| **Defendants.** | ) | |

## THIRD AMENDED COMPLAINT

Plaintiff Dustin J. Kittle, by and through undersigned counsel, hereby files this Third Amended Complaint seeking relief for violations of the Farm Credit Act of 1971, the United States Constitution, the Administrative Procedures Act, the Federal Tort Claims Act, and other applicable laws and regulations.

## JURISDICTION AND VENUE

1.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1343, 1346(b)(1), and 1361. *See Minnesota Chippewa Tribe v. Carlucci*, 358

F. Supp. 973, 975-76 (D.C. Cir. 1973); *see also National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974).

2.      This Court further has subject matter jurisdiction pursuant to 5 U.S.C. § 702.

3.      Plaintiff seeks declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, and to compel and hold unlawful agency action under 5 U.S.C. § 706.

4.      Plaintiff has exhausted all available and required administrative remedies by submitting a Standard Form 95 to the FCA on April 29, 2024, which was denied on October 28, 2024 (28 U.S.C. § 2675(a)).

5.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this is an action against officers of the United States in his or her official capacity, the Plaintiff resides in this judicial district, a substantial part of the actions or omissions giving rise to the claim occurred in this district, and/or the action does not involve real property.

6.      Venue is further proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

### Dustin J. Kittle – Tennessee Rancher and Agricultural Attorney.

7.      Plaintiff Dustin Kittle ("Mr. Kittle") is an adult citizen of Maury County, Tennessee and was such during the entire time period relevant to this Complaint.

8.     Mr. Kittle is a rancher and a former borrower of the Farm Credit System who was wrongfully divested of his Class A Voting Stock by operation of law.

9.     As a former borrower, pending applicant, and prospective future borrower, Mr. Kittle is and was an intended beneficiary of the federal laws and regulation applicable to the United States Farm Credit System, to include the guarantee of Farmer Borrower Rights promulgated by the Farm Credit Act.

10.    Mr. Kittle has been affected to his detriment by the actions or omissions of the President of the United States of America, the Farm Credit Administration, and the Board Members, Officers, and Agents of the Farm Credit Administration.

### **Joseph R. Biden Jr. – 46th President of the United States of America**.

11.    Defendant Joseph R. Biden, Jr. ("President Biden") served as the President of the United States of America from January 20, 2021 until January 20, 2025 and is sued in his official capacity as President of the United States of America.

12.    As President of the United States of America, President Biden had the sole authority to appoint a three-member Board to serve the Farm Credit Administration.

### **Farm Credit Administration – Government Sponsored Enterprise.**

13.    Defendant Farm Credit Administration ("FCA") is an independent agency charged with administration and oversight of the Farm Credit System.

14.    The FCA is also charged with ensuring compliance with certain federal laws and regulations applicable to the Farm Credit System, to include the Farm Credit

Act, the Equal Credit Opportunity Act, and the Constitutional guarantees of Due Process.

15.     The FCA's operations, including but not limited to the cost of administering the Farm Credit Act and the salaries of the FCA's Board Members, are funded and paid for by the Farm Credit System borrowers themselves, including Plaintiff.

**Jeffery S. Hall – Farm Credit Administration Board Chairman.**

16.     Defendant Jeffery S. Hall ("Mr. Hall") is the FCA Chairman and Chief Executive Officer and is responsible for directing the implementation of policies and regulations adopted by the Board and executing the administrative functions and duties of the FCA.

17.     Mr. Hall was appointed to the FCA Board by President Barack Obama ("President Obama") on March 17, 2015 and was named FCA Chairman and Chief Executive Officer by President Donald Trump ("President Trump") on January 20, 2025; despite the fact Mr. Hall's term on the Board expired October 13, 2018.

**Wendy R. Laguarda – Farm Credit Administration Inspector General.**

18.     Defendant Wendy R. Laguarda ("Ms. Laguarda") is or was the FCA's Inspector General, having been appointed to the position on August 1, 2017.

19.     As Inspector General, Ms. Laguarda is or was charged with conducting independent audits, inspections, and investigations of the Farm Credit System.

20. Upon information and belief, since the filing of Plaintiff's Second Amended Complaint naming her as a Defendant in this action, Ms. Laguarda has been removed from her position as FCA's Inspector General.

## FACTS

21. The Farm Credit System was created on July 17, 1916, with the passage of the Federal Farm Loan Act, signed into law by President Woodrow Wilson.

22. The Federal Farm Loan Act established the network of cooperative banks and associations to provide credit to farmers, ranchers, and agricultural producers.

23. The FCA, the federal regulator of the Farm Credit System, was created on March 27, 1933, by an executive order issued by President Franklin Roosevelt.

24. The Farm Credit System, and specifically the FCA, is governed by a three-member Board; established through the enactment of the Farm Credit Act of 1953.

### **The Farm Credit Administration Board.**

25. The FCA Board is to consist of three (3) Presidentially Appointed, Senate-confirmed members who are broadly representative of the public interest, with no more than two being members of the same political party.

26. The FCA Board members serve in six-year terms, staggered and fixed so that a term expires every two (2) years regardless of when the member was appointed.

27. Structured as a true term limit, the FCA Board members may not succeed themselves and are not eligible to serve a second term on the Board.

28.     At the time President Biden was sworn in as President on January 20, 2021, the FCA Board required two (2) immediate appointments, as FCA Board Chairman Dallas P. Tonsager had passed away on May 21, 2019 and Mr. Hall, an FCA Board member appointed by President Obama, had his term expire on October 13, 2018.

29.     President Biden made no appointments in the first year of his Presidency.

30.     On May 21, 2022, the only other member of the FCA Board, Glen Smith ("Mr. Smith"), had his term expire; resulting in no members, at that time, serving in a legally-prescribed term on the FCA Board.

31.     President Biden did not make his first appointment to the FCA Board until October 2022; when he appointed Vincent G. Logan ("Mr. Logan") as a Board member and selected him as the FCA Chairman and Chief Executive Officer.

32.     Despite the legal mandate for FCA Board member terms to stagger on a two-year rotation, Mr. Logan was the first Board member appointed in five (5) years.

33.     No further appointments to the FCA Board were made by President Biden until the instant action was filed by the Plaintiff on March 22, 2024.

34.     At the time of filing the instant action, Mr. Logan was the only FCA Board member serving in their legally-prescribed term.

35.     President Biden was served with the Complaint in this action on May 6, 2024; on that same day, the United States Senate received President Biden's nomination of Marcus D. Graham ("Mr. Graham") to serve on the FCA Board.

36.     President Biden designated Mr. Graham to replace Mr. Smith on the FCA Board, whose term had previously expired; however, Mr. Graham did not receive Senate confirmation and was not appointed to the FCA Board.

37.     During his tenure, President Biden failed to make any nomination to replace Mr. Hall on the FCA Board, whose term had previously expired.

38.     As of January 20, 2025, the date President Biden left office, only one (1) FCA Board member, Mr. Logan, was serving in their legally-prescribed term.

**Funding the Farm Credit Administration and the FCA Board.**

39.     The FCA's operations are funded by assessments paid by the System institutions it regulates, rather than appropriations, with the costs ultimately borne by System borrowers and stockholders, including Plaintiff.

40.     FCA Board members in holdover status may change their duty station outside of the Washington D.C. area, enabling them to be reimbursed for travel to headquarters, transportation expenses to their new duty station, and lodging.

41.     Upon information and belief, Mr. Hall has exercised his option to relocate to Kentucky and/or Indiana while in holdover status.

42.     Upon information and belief, Mr. Smith has exercised his option to relocate to Iowa while in holdover status.

43.     FCA travel and transportation expenses increased by 80.6%, or from $2,441,070 to $3,029,833 from FY 2017 to FY 2018 and increased by 94.4%, or from $1,227,308 to $2,386,317 from FY 2022 to FY 2023.

44.     The stockholder-borrowers of the Farm Credit System, including Plaintiff, bear the increased expenses of having FCA Board members in holdover status due to a President's failure to make the required appointments.

45.     Additionally, with more Agency funds being allocated for holdover expenses, less funds are available for the operations of the offices tasked with handling the borrower complaint process.

46.     Extended holdover positions undermine the independent status of the FCA, as Board members without a fixed term are more vulnerable to the vagaries of politics.

47.     The "remote" status of Board members impedes the ability of the FCA to carry out its statutory obligations and duties and to oversee the institutions it regulates.

**<u>Rights and Protections afforded to Farm Credit System Borrowers.</u>**

48.     System institutions are not subject to the same regulations and laws established for borrower protection as are private lenders, with essentially all System loans being pursued for agricultural or business-related purposes and thus exempted from the Truth in Lending Act, the Home Ownership Equity Protection Act, the Real Estate Settlement Protection Act, and the Fair Debt Collection Practices Act.

49.     Instead, System borrowers were provided certain protections in the Agricultural Credit Act of 1987.  *See* 12 U.S.C. §§ 2199-2202e.

50.     While contrary to the Congressional record, current legal precedent does not provide System borrowers with a private right of action to enforce the rights established for their benefit under the Agricultural Credit Act of 1987.

51.     Administrative action by the FCA is the exclusive remedy available to borrowers for violations of the borrowers' rights by a System institution.

52.     FCA's position is that, "[a]s the regulator of the Farm Credit System, FCA is **required** to enforce the borrower rights provided under the Farm Credit Act of 1971, as amended." NR 21-12 (6-2-21), Exhibit A (emphasis added).

53.     FCA reports to the Consumer Financial Protection Bureau in its annual report on System institution compliance with the ECOA and Regulation B that:

> FCA continues to maintain its enforcement powers in a fashion similar to other Federal Bank Regulatory Agencies. FCA is authorized to initiate enforcement actions, including cease and desist, officer and director removal, and civil monetary penalty proceedings, when its Office of Examination determines FCS institutions… are in material violation of applicable laws and regulations, **including those in the area of consumer protection.** When appropriate, FCA also uses a variety of informal enforcement methods to ensure compliance. (Emphasis added). Exhibit B.

54.     Yet, the FCA had no formal enforcement actions to ensure compliance with ECOA and Regulation B from 2015 through 2023. *Id*.

55.     FCA further says, "**As the regulator of the [Farm Credit System], we have the authority to enforce borrower rights.** If, during our review, we identify any violations of law or regulation, **these findings are handled under our examination and enforcement authorities**, which include the authority to issue borrower rights directives. Please keep in mind that FCA does not have the authority to interfere in the management or business decisions of an FCS institution unless federal laws or regulations have been violated or unless the decisions affect the safety and soundness of the institution." *See* Exhibit C (emphases added).

56.     However, the FCA has also simultaneously taken the position that it will not administratively act or enforce the rights and protections afforded to borrowers under federal laws, even when it is blatantly apparent that a System lender is violating federal law(s).

57.     For example, during the 657-day pendency of the Plaintiff's borrower complaint with the FCA, the Administration consistently asserted as follows:

> As the regulator for the System, FCA ensures that these institutions operate in a safe and sound manner and in compliance with applicable laws and regulations. FCA also looks into borrowers' or other interested parties' allegations of wrongdoing by System institutions. If we find that System institutions have violated applicable laws or regulations, FCA has several enforcement options to bring about corrective actions, including requiring management to address weakness in internal processes that led to those violations. However, FCA's authority does not include providing monetary or personal relief to an applicant or borrower. As an arm's length regulator, FCA cannot intervene in the business decisions made by System institutions unless those decisions violate applicable laws or regulations. **Additionally,**

**FCA does not mediate or adjudicate disputes between System institutions and borrowers.** Exhibit D.

58.     In a shocking admission, the FCA has been unable to provide a single instance wherein it has used its enforcement authorities to enforce the borrower rights protections of the Farm Credit Act since they were established in 1987. Exhibit E.

59.     No where in either FCA regulation or policies is there a detailed administrative procedure for review of borrower complaints or for seeking enforcement of borrower rights.

60.     Rather, the FCA says its borrower complaint process is informal, wherein it reviews complaints about noncompliance with the laws and regulations over which it has enforcement authority. Exhibit F.

61.     Borrowers who believe their rights have been denied or violated are encouraged by the FCA to inform the institution and make a good faith effort to resolve the problem. If this is unsuccessful, the FCA says borrowers may submit a complaint. *Id*.

62.     Upon information and belief, FCA's policies and procedures for handling such borrower complaints are as follows:

> a. OCPA receives borrower complaints and logs them into its tracking program, CTS.
>
> b. OCPA screens the complaints to determine if referral to another FCA office is needed.

i. If the complaint is not referred to another office, OCPA responds within 2 weeks.

ii. If the complaint is referred to another office, referral is made within 2 days.

c. An acknowledgment letter is sent to the complainant.

i. The goal stated in the FCA Policies and Procedures Manual is to send an acknowledgment within 3 business days.

d. OCPA researches and analyzes the complaint and prepares a draft response.

i. Examiners in OE often perform research, sometimes including contacting the association and complainant for supporting documentation.

ii. Examiners review documentation, including loan files, application package, payment history, and notices sent by the association to the borrower or applicant.

e. On occasion, the complainant is contacted to clarify their concerns or request additional information.

f. OCPA reviews the analysis and proposed draft response, revises as necessary, and sends the final response to the complainant. Exhibit G.

63.    OCPA and OE have weekly meetings to discuss the status of outstanding borrower complaints. *Id*.

64.    In 2008, of the 30 borrower complaints received by FCA, 11 (or 37%) received a final response within 30 days, 16 (or 53%) received a final response within 31-60 days, 2 (or 7%) received a final response within 61-90 days, and 1 (or 3%) received a final response after more than 90 days. *Id*.

65.    In 2009, of the 38 borrower complaints received by FCA, 18 (or 47%) received a final response within 30 days, 12 (or 32%) received a final response within 31-60 days, 5 (or 13%) received a final response within 61-90 days, and 3 (or 8%) received a final response after more than 90 days. *Id*.

66.    Upon information and belief, the FCA's Policies and Procedures Manual establishes a goal of providing a final response to borrower complaints within 30 days, consisting of:

    a. 2 days for OCPA to log the complaint and determine if referral is needed;

    b. 21 days for the subject matter office to complete research and prepare draft response after receiving referral from OCPA; and

    c. 7 days for OCPA to prepare and send the final response after receipt of analysis and draft response. *Id*.

67.    As a result of FCA often not achieving its goal of providing a final response to borrower complaints within 30 days, OCPA adopted a policy of communicating with the complainant when research is taking an extended period of time; more specifically, to keep the complainant and/or congressional offices informed of progress on their complaints and achieve the President's goal for transparency, OCPA is to send update letters every 30 days to the complainant when reviews take longer to complete. *Id.*

68.    As part of an OIG audit, it was determined that in 4 cases, OE research took 30+ days and documentation was insufficient to identify the cause of delay; and in 6 cases, OCPA preparation and final response took 14+ days and documentation was insufficient to explain the cause of delay (but in 3 of these cases, the OCPA Director was on extended leave). *Id.*

69.    In response to these findings, OE and OCPA were supposed to develop a back-up plan when key personnel are not available to perform timely research or response. *Id.*

70.    Many, if not most of, complainants are forced to wait months to receive an update from FCA.

71.    What's more, even after receiving a final response from the FCA, complainants have no avenue for challenging the FCA's determination.

72.     Similarly, if FCA's final response confirms violations of statute and/or regulations, complainants have no process available at present to require administrative enforcement by the FCA as it relates to the violations.

73.     By failing to delineate administrative processes for reviewing borrower complaints and enforcing compliance with the borrower rights provisions, the FCA has made it impossible for System borrowers or applicants to exercise their statutory and regulatory rights.

74.     There is no justifiable reason for the FCA's delay in providing final responses on borrower complaints beyond 30-60 days or its refusal to require compliance by System institutions with the applicable laws and regulations using its enforcement authorities.

## Internal Dysfunction of the Farm Credit Administration.

75.     With the majority of the FCA Board in holdover status, it has failed to provide effective, or even adequate, oversight of the Agency's offices.

76.     The Board is responsible for overseeing and ensuring the efficiency and adequacy of all offices within the FCA, including the Office of Congressional and Public Affairs ("OCPA") within the Office of Examination ("OE"), which oversees the borrower complaint process.

77.     The OCPA's internal procedures manual, including internal procedures for borrower complaints, remained in draft format as of 2022. *See* FCA OIG Inspection

Report I-22-01: Farm Credit Administration's External Communication Process (Aug. 2, 2022).

78.    Additionally, the OE has significant staffing needs, as well as a scheduling process that has not been updated in ten (10) years, significantly limiting OE's ability to effectively oversee the scheduling and process of time sensitive borrower complaints.    *See* FCA OIG Inspection Report A-22-03: Farm Credit Administration's Examiner Staffing Program (Jan. 30, 2023).

79.    Since the FCA created the Office of Data Analytics and Economics ["ODAE"] in 2019, the ODAE's staff has more than doubled, and its budget has increased by nearly 60%, to a budget of around $3 million, with salaries and expenses being the largest expense in the ODAE's budget.[1]

80.    Although the FCA has invested significant resources to create the ODAE, three years following its creation, there was still a "lack of a defined overarching [FCA] policy outlining ODAE's responsibilities and requirements" and the "ODAE's internal procedures, many of which remain in draft, lack detail and consistency, and were not prioritized." "By not updating policies and procedures to explain the responsibilities of ODAE and how it can best work with other FCA offices, important requirements and milestones are at risk of not being met and other

---

[1] In 2022, the ODAE spent $2,111,519 of $2,350,470 (or 89.8%) of its expenditures on Salaries and Benefits.

FCA offices are at risk of having to undertake or duplicate ODAE's responsibilities."
*See* FCA OIG Audit Report A-23-01: Farm Credit Administration's Office of Data Analytics and Economics (June 14, 2023).

81.    The OIG also found that prior to the start of Former Chairman Logan's term, ODAE met with the FCA Board members and the FCA Chief Operating Officer on a monthly basis to provide updates on its current projects, receive input on future projects, and discuss Board priorities, but those meetings were no longer occurring. *See id*.

82.    While the FCA's Office of Management and Budget ("OMB") requires a major rule analysis for every proposed rule the FCA issues. The FCA only conducted one analysis from November 2019 through September 2022, despite the requirements set forth in the Congressional Review Act, OMB Memorandum M-19-14, OMC Circular A-4 and additional federal guidance and authorities. During this timeframe, the FCA's Office of Regulatory Policy was no longer staffed with economists and instead relied on the ODAE to support its rulemaking responsibilities and to perform analyses on proposed rules. ODAE planned to participate in the analysis on eight rules, four in FY 2023 and four in FY 2024. However, as of February 2023, or five months into the fiscal year, the ODAE had not conducted an economic impact analysis on any of the four proposed rules scheduled for FY 2023. *See id*.

**<u>Allegations of Substantial Misconduct by FCA Inspector General.</u>**

83.     At the time Wendy R. Laguarda was named Inspector General ("IG") in July 2017, she was then serving as the Executive Assistant to FCA Board Chairman Dallas P. Tonsager.

84.     Upon information and belief, Ms. Laguarda came to the FCA OIG with absolutely no audit, investigative, inspection, or evaluation experience.

85.     Within nine (9) months of her being named IG, the Integrity Committee ("IC") of the Council of Inspectors General on Integrity and Efficiency ("CIGIE") requested an independent investigation into allegations of wrongdoing by Ms. Laguarda. Exhibit H.

86.     The allegations centered around Ms. Laguarda engaging in substantial misconduct, including violations of the Inspector General Act. *Id*.

87.     Specifically, upon information and belief, CIGIE IC requested an investigation into the following allegations:

> a.  Ms. Laguarda reducing the scope of an ongoing audits of the FCA to appease members of FCA management after meeting privately with them;
>
> b.  Ms. Laguarda removing the Deputy Inspector General and Counsel to the Inspector General by a single person reduction in

force because she had aggressively pursued investigations against senior FCA officials, including a member of the FCA's Board; and

c. Ms. Laguarda improperly sought and relied upon legal advice from the FCA's Office of General Counsel, thereby compromising her independence. *Id*.

88.    Upon information and belief, Ms. Laguarda, as the FCA IG, lacked independence and acted corruptly and unethically during the time period relevant to the allegations in this Complaint.

89.    Upon further information and belief, Ms. Laguarda acted under the influence of FCA management and/or to protect the agency in connection, as opposed to serving to independently investigate potential violations of law and serve as a critical check on potential corruption, fraud, waste, and mismanagement.

**Allegations Central to Plaintiff's Borrower Complaint.**

90.    In July 2020, Mr. Kittle became a borrower and stockholder in a System institution, Alabama Farm Credit, ACA ("AFC").

91.    In July 2021, while working towards refinance that had been in the works with his Branch Manager for more than a year, Mr. Kittle discovered concerns over AFC's handling of his initial loans, as well as the pending refinance.

92.    Upon raising those concerns and requesting a copy of his loan file, AFC placed its Chief Risk Officer, Jody Campbell, and subsequently its attorney, Chris

Glenos ("Mr. Glenos") of the Bradley Arant Boult Cummings, LLP law firm ("Bradley") over Mr. Kittle's account.

93.     Mr. Glenos subsequently began an egregious campaign of retaliation against Mr. Kittle and caused AFC to violate federal laws and regulations, including the Farm Credit Act and the Equal Credit Opportunity Act.

94.     Mr. Glenos and AFC violated the Act, ECOA, and/or applicable regulations numerous times. *See* Exhibit I.

95.     For example, on August 12, 2021, Mr. Glenos/AFC refused to provide Mr. Kittle copies of appraisals of his collateral. On August 16, 2021, Mr. Glenos/AFC again violated applicable laws and regulations by refusing to provide a copy of AFC's Charter, Bylaws, and appraisals without Mr. Kittle signing a release of legal claims on August 16, 2021. And on August 20, 2021, Mr. Glenos/AFC egregiously violated applicable laws and regulations by saying AFC would not accept any new credit applications from Mr. Kittle while he is threatening or pursuing legal claims. *Id*.

96.     In response to the continued violations of his rights as a borrower, Mr. Kittle submitted a borrower complaint to the FCA on August 24, 2021, and the FCA began its investigation on August 26, 2021, with the FCA informing Mr. Kittle that it would "strive to provide a response within 60 days" and that if it were unable to finish its review in 60 days, it would notify him of the same and provide him with information

on the status of its review. The FCA also said if it found that a violation has occurred, "[it would] use [its] examination and enforcement authorities to require corrective action." Exhibit C.

97.     On October 6, 2021, AFC and/or Mr. Glenos violated applicable laws and regulations in saying it will not accept any new loan applications due to the unresolved legal claims, and again on October 26 2021 by saying it will not entertain any proposal to deviate from the existing loan agreements unless Mr. Kittle agreed to release all claims against it and its attorneys, divest his stock, and agree no further loan modifications or extensions of credit would be provided. Exhibit I.

98.     That same day, the FCA sent Plaintiff a letter that it was "still reviewing [his] concerns", its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." Exhibit C.

99.     Plaintiff responded saying "things have taken a turn for the worse", "[AFC is] attempting to coerce me into signing a release of claims against them", "I don't want to do it but they have blocked all my requests for credit outright", and "**It's retaliation, it's fraud, and it's coercion – and I really need your help**." *Id*. (emphasis added).

100.   On October 29, 2021 Mr. Glenos/AFC once again said AFC will not accept any new credit applications from Mr. Kittle. Exhibit I.

101.   As a result, on October 30, 2021 Mr. Kittle contacted the FCA, saying, "Mr. Glenos recently sent us a letter stating that he unilaterally ordered our farm credit lending institution to not consider any attempts at credit, now or in the future, unless we sign a full release of claims. **That is a blatant violation of the Farm Credit Act and almost every equal lending statute in the country**… we have suffered significant financial harm and distress in having to conduct our banking under the U.S. Farm Credit Act with a law firm who is intent on pushing us out of the U.S. Farm Credit System. We have dealt with this since July."  Exhibit C.

102.   With no response and things escalating, on November 3, 2021, Mr. Kittle forwarded the FCA additional documentation demonstrating clear violations of the Act that had occurred since his initial complaint in August. Exhibit C.

103.   On November 5, 2021, Kittle forwarded the FCA a recorded call of Glenos saying AFC could place his loans in distress or would do "anything reasonable" on Kittle's loans if he would just sign a release of legal claims in favor of AFC, and the Bradley law firm. Kittle explained to Glenos that a) a distressed notice would be improper; b) he had sufficient capital to meet his loan obligations; b) he had never missed or so much as been late on a loan payment; c) Glenos was engaging in criminal extortion; and d) the call was being recorded. *Id*.

104.   In his email to the FCA, Kittle requested the recording and correspondence be forwarded to the FCA's Director and General Counsel, saying, "this private attorney

has place[d] the subject loans in distressed status and provided notice of same despite the fact the borrowers have never missed or even been late on a payment – and despite the fact they have a current loan to value at or near 50% with more than $4 million in appraised real property equity and livestock assets they own free and clear… These borrowers have had their ability to obtain credit frozen by a private attorney as well as their lending institution… for the past 100 days… **The United States Farm Credit Administration is currently on notice of and has been for more than 60 days now [of] an active effort to extort a borrower into signing a full release of their federal rights under the US Farm Credit Act just so that lending institution and its attorneys can have their wrongful acts protected – and the payoff for that borrower is to be able to obtain credit again through the US Farm Credit System. This agency is currently allowing this to happen, as they have been placed on notice of same and have failed to take any corrective action whatsoever.**" *Id*.

105.   Within hours of Kittle reporting Glenos for professional misconduct in his representation of AFC on November 8, 2021, AFC and/or Glenos placed Kittle's loans in distress with the potential of foreclosure within 45 days despite Kittle never having missed a single payment in the history of his loans with AFC. In fact, just days before his account was turned over to Glenos, his local branch manager said, "Your payment history and account is in excellent standing with AFC and we look

forward to working to meet your credit needs. I am sorry for the misunderstanding".
Exhibits C and I.

106.   The same day, a partner at Bradley informed AFC that a conflict of interest between the firm and AFC had arisen and requested AFC provide its consent to the conflict. Exhibit I.

107.   Specifically, Bradley told AFC that:

> a.  the "firm's further work on an existing matter, including, without limitation, potentially litigating issues arising from that firm's prior legal work, may generate a conflict of interest under the rule when there is a plausible claim that the prior work was deficient, especially if there are alternative strategies for handling the matter, and one is better for the law firm and another is better for the client.";
>
> b.  "In such an instance, the potential exists that the law firm will pursue the strategy that is better for the firm so as to protect its prior work from blame" and that "[i]n this situation, **it could be argued that the allegations made by Dustin Kittle regarding the legal services provided by our firm may result in us pursuing a settlement that would reduce the likelihood of Mr. Kittle pursuing some type of claim against the firm**."(emphasis added);

c. "For example, **the firm could focus the new matter on a way to resolve the entire dispute and obtain from Mr. Kittle and Kittle Farms, LLC a release that benefits the firm and avoids criticism of the firm's interactions with Mr. Kittle**." (emphasis added). *Id*.

108.  Kittle forwarded the distressed loan notice to the FCA the same night, saying, "[his] loans were just placed in distress by this rogue attorney trying to commit extortion – he emailed us the letter from Alabama Farm Credit letterhead. **Someone up there needs to wake up and help us – and quickly – this is serious**… **These institutions are clearly violating the Farm Credit Act and are causing me financial harm… please help me get this finalized or some relief soon**." Exhibit C.

109.  After no response from the FCA, Kittle asked for an update on November 10th, saying, "**do your job and do it now** – you are allowing innocent borrowers to be extorted and to have their properties foreclosed on when they have never missed a payment. **You have had notice of this for months and you have done nothing to stop it** – please accept this correspondence as notice that **the US Farm Credit Administration has caused harm in their lack of response to violations by a lending institution under its watch. There is additional harm being allowed to occur now that could be stopped if this Administration would simply direct this**

**institution to comply with the Farm Credit Act** by allowing borrowers to conduct their banking business and to communicate with their bank without the impediment of contacting a private law firm in Birmingham, Alabama to even check the balance of their account. The delay in a response by the FCA has resulted in a wrongful foreclosure being initiated against borrowers – by a private law firm – and the exercise of rights afforded under the US. Farm Credit Act have been conditioned on the release of legal claims for retaliation in reporting violating of that same Act. It is time for this Director to take action – your borrowers are being extorted and you are meeting about it once a week every Tuesday like you had someone report that they didn't get correct change back… History will not look kindly on this Administration's delay and inaction on a file they received months ago and refused to even enter into a 3-way call on to tell the lending institution to communicate with the borrowers. Please also forward this to legal. If there is any other independent or governmental body who can [step] in to stop this corruption, send it to them as well." *Id*.

110.   The following day, the OCPA responded to Mr. Kittle's email thanking him for the update, explained they were reviewing his concerns, that "[they] understand the seriousness of the situation and are making every effort to thoroughly investigate the matters", and "[they] do ensure that System institutions operate in a safe and sound manner and that they do comply with applicable laws and regulations", that

"the law does not allow [them] to mediate disputes between System institutions and borrowers", but "[i]f an institution has violated a law or regulation, [they] will use [their] enforcement authorities to require the institution to take correction actions. [They] appreciate [him] keeping [them] informed and will provide periodic updates on the status of [their] review." *Id*.

111.   On November 12, 2021, Kittle told the FCA "**based on the fact we are 90 days in with no effort to have your lending institution correct the violations, I have a strong feeling that is exactly what the FCA wants… The effort by this office is a disservice to the agricultural borrowers who depend on this Administration**." *Id*.

112.   Due to the FCA's complete and utter failure to use its examination and enforcement authorities to require corrective action, Mr. Kittle was forced to pay off his loans with AFC on December 1, 2021 – 20 years early - to avoid the wrongful foreclosure of his farm and home located in Maury County, Tennessee for his refusal to sign a release of legal claims in favor of in order to receive loan servicing guaranteed him under federal law.

113.   In order to do so, Mr. Kittle had to liquidate his assets (including livestock, equipment, retirement accounts, etc.), obtain personal loans from friends and family, sell a historic 100-acre farm he had purchased just months before, and obtain financing (on significantly less favorable terms) through a non-Farm Credit lender.

114. Mr. Kittle was ultimately forced to sell his family's home, which was located in Maury County, Tennessee.

115. Forty-six days later, the FCA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." *Id*.

116. On March 7, 2022, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." *Id*.

117. On July 26, 2022, Mr. Kittle emailed the OCPA asking for an update on the investigation. *Id*.

118. On July 28, 2022, the OCPA responded saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." *Id*.

119. On September 28, 2022, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." *Id*.

120.   On December 1, 2022, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." *Id*.

121.   On January 26, 2023, Mr. Kittle submitted a request to the FCA OIG for review of his complaint with the OCPA. *Id*.

122.   In his request, he explained, "In August 2021… [o]ur claim was assigned to Investigator Russell Middleton, who participated in an hour plus long telephone call with me days after the complaint was made. Since that time, I have reported and provided documented evidence of [numerous violations] to Investigator Middleton and the FCA… **The Farm Credit Administration was informed of the time-sensitive nature of my complaint and the potential for irreparable harm but, remarkably, failed to take any action whatsoever.** Instead, even now 18 months after the complaint was first made, I continue to receive boiler-plate correspondence from Investigator Middleton every few months informing me that, due to the complexities of our complaint, the investigation has not yet concluded. **In short, my family lost our home because the Farm Credit Administration failed us.** We provided concrete and documented evidence showing that the Farm Credit Lender was engaging in illegal acts under the Farm Credit Act, and potentially even criminal law, but could not get so much as a response to that complaint that allowed us to

evaluate our other options. **I am seeking answers as to how this happened**." *Id.* (emphasis added).

123.   On February 3, 2023, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." *Id.*

124.   Mr. Kittle forwarded this correspondence to the FCA OIG, who responded for the first time, acknowledging his January 26th request and saying it was "in the process of reviewing the details of [Mr Kittle's] complaint and FCA's actions in response to [his] August 2021 complaint." *Id.*

125.   On April 3, 2023, the OCPA sent Mr. Kittle a letter saying it was "still reviewing [his] concerns", that its "goal was to complete [its] review within 60 days of receiving [his] complaint, but the complexities of the matters raised in [his] complaint require additional time." *Id.*

126.   Mr. Kittle responded asking "**Can you advise as to whether one of these investigations has ever concluded? Or is it your practice to simply send out these letters indicating that more time is needed until it goes away? This involves an individual claim and a single financial institution – you are now going on two years without so much as one substantive update. This is a complete sham, and you all should be ashamed of what you have allowed to**

**happen. I hope nothing like this ever befalls your own families**." *Id*. (emphasis added).

127.   On April 6, 2023, Mr. Kittle requested an update from FCA OIG. *Id*.

128.   On April 12, 2023, the FCA OIG responded to Mr. Kittle's April 6th request saying they would "be sending a status update in the next day or so." *Id*.

129.   On April 13, 2023, the FCA OIG said they "[had] reviewed [the] January 26, 2023 complaint regarding the Agency's review of [his] August 24, 2021 borrower complaint. We interviewed staff from the Office of Congressional and Public Affairs (OCPA) and the Office of Examination tasked with undertaking the borrower complaint review. We independently reviewed written documentation to substantiate the process followed by the Agency. Multiple offices within FCA are involved in the review and analysis. Based on our review, we found that the agency is still in the process of reviewing your borrower complaint. **FCA policy establishes a general expectation that borrower complaints receive a final response within 60 days**, though notes that this timeframe is a goal, with response times depending on, among other things, the complexity of the complaint and the need to obtain additional information from the complainant or institution. If the agency's review cannot be completed within 60 days, OCPA will periodically send a standard status letter to the complainant until the review is completed and a final response letter is sent. Notwithstanding the boilerplate nature of the letters that you received from

OCPA, the agency appears to be making progress on addressing your complaint. We will conduct periodic status reviews of your complaint and hold it open and pending until the Agency concludes its review." *Id*.  (emphasis added).

130.   On June 12, 2023, the OCPA sent Mr. Kittle a letter with the FCA's findings from his August 2021 complaint. Exhibit D.

131.   **It took 657 days for Mr. Kittle to receive any meaningful response from the OCPA or anyone at the FCA.**

132.   This delay was unreasonable and contrary to the FCA's policy establishing a protocol that borrower complaints receive a final response within 60 days.

133.   The FCA ultimately found AFC, primarily through Mr. Glenos, had violated Mr. Kittle's rights under the Farm Credit Act and Equal Credit Opportunity Act, numerous times. Exhibit D.

134.   Notwithstanding the numerous violations the FCA found, the OCPA's findings – 657 days after the fact – were now useless for Mr. Kittle, as there is no private cause of action available to Mr. Kittle for pursuing recourse for the numerous violations found by the FCA of his rights under the Act.

135.   And the FCA remains unwilling to provide recourse, citing: "We are also aware that since you first wrote to us, you have paid off your loans with the association, thereby ending the lending relationship." Exhibit D.

136. Mr. Kittle's lending relationship ended because the FCA took 657 days to do *anything* related to his borrower complaint.

137. The FCA found, at a minimum, the following violations of statute or regulation:

   a. "[T]he association issued you a written adverse credit decision on August 20, 2021, citing both an incomplete application and a withdrawal of an application. However, the notice failed to specify whether it was issued in response to all three of your credit requests or only some of them… You exercised your [Credit Review Committee] rights and a meeting with the CRC was held on October 18, 2021… We confirmed the CRC considered the August 2021 line of credit application and the release of your mother's property, but not the refinance request. The CRC written decision to uphold the association's denial of two of your credit requests was provided to you on October 27, 2021. A CRC decision on the refinance request was not made."[2]

   b. "[T]he association did not notify you in writing of the date the [requested financial] information was needed or include a written statement advising

_____

[2] As of the time of this filing, a decision by AFC still has not been made on Mr. Kittle's pending refinance from August 2021. The refinance was imminent in July 2021 and had been pending for weeks as part of Mr. Kittle and his branch manager's plan to consolidate multiple loans into a single loan, allow Mr. Kittle to access his current equity, and lock-in historically low interest rates.

you if the information was not received by that date, no further consideration would be given to the applications as is required by 12 CFR 1002.9(c)(2)… The failure to provide the information could impact future credit and servicing decisions, but failure to provide updated financials alone cannot be the sole reason for putting a loan in default status or foreclosing on a loan."

c. "You also objected to one appraisal referencing values as not being an arm's-length transaction. FCA regulation 614.4250(a)(1) requires associations to value collateral at the present market value. Further, FCA regulation 614.4200(b)(1) instructs institutions to base the LTV on the appraised value. Using the updated appraisals, your LTV would have been below the 75% LTV the association required."

d. "We further confirmed the association provided you the appraisals on the remaining real estate collateral at your request as required by FCA regulation 618.8325(b). Specifically, the association provided your attorney the appraisals on the New Highway 7 property and your mother's property on August 3, 2021, and the appraisals of the two Santa Fe Pike properties on August 18, 2021. The association treated the request as being limited to new appraisals. However, we noted your request for the appraisals was not limited to new appraisals. Therefore, the association

should have also sent you the existing appraisal on the 1800 Gravel Hill property. We have addressed this with the association… Whether or not an institution charges an applicant or borrower for the cost of obtaining an appraisal is a business decision. It is, however, a borrower's right to a copy of those appraisals, a right not controlled by who pays for ordering any appraisal."

e. "You further informed us the association, through its legal counsel, conditioned certain credit transaction on obtaining a release of liability from you. Specifically, you asserted the association required you to release it from liability before considering your credit request to remove its lien on your mother's property and before considering any restructuring request. The association acted improperly if it attempted to condition certain credit transactions on receipt of a liability waiver from you. This would be specifically prohibited if such a release were sought before providing statutory rights, such as loan servicing. We understand you did not sign a release of claims and in August 20, 2021, the association sent an adverse credit decision notice. Relatedly, you explained around the same time, the association said it would only consider your future credit requests if you released them from liability. Even without a current borrowing relationship, a lender may not refuse to accept a credit application.

According to 12 CFR 1002.4(b), a creditor is prohibited from discouraging a person from making or pursuing a credit application."

f.  "After you filed your complaint with us, the association identified your loan as distressed and, on November 8, 2021, sent you a distressed loan servicing (DLS) notice. On receipt of the DLS notice, you contacted us to express concern over your account being identified as distressed even though you had never missed a payment. You also objected to the association sending you a 45-day DLA notice warning you foreclosure would be pursued if you did not apply for servicing. The association identified your loans as "distressed" in accordance with FCA regulation 617.7000. The association determined you lacked the financial ability to repay your loans… After this determination, the association sent the DLS notice as required by FCA regulation 617.7410(a). However, FCA regulation 617.7410(a) indicates the non-foreclosure DLS notice would have been the appropriate notice to send instead of the 45-day notice since your account was current at the time." Exhibit D.

138.  Despite the fact that Mr. Kittle was funding FCA's operations during the time period when his rights under the Farm Credit Act and Equal Credit Opportunity Act were being violated, and the fact that the FCA is uniquely required by law to enforce his rights as a System borrower, the FCA is presently maintaining its refusal to afford

Mr. Kittle his rights and protections under the Farm Credit Act through its enforcement authorities.

**The FCA's Abuses of the Freedom of Information Act and Retaliation.**

139. On February 6, 2023, Mr. Kittle submitted a request for the records of the FCA's investigation into his August 2021 complaint pursuant to the Freedom of Information Act, pre-approving charges up to $500.00. Exhibit C.

140. On February 14, 2023, FCA FOIA Public Liaison Jacqueline Baker responded to the request, saying that a) the FCA would charge for manual searches for records and review, as well as the pro-rated cost of the salary of the employees doing the work; b) the FCA found 170 potentially responsive documents that would require manual review and processing; c) the FCA anticipates this taking approximately 14.5 hours; d) the FCA anticipates the cost of processing these documents to be $1,345; e) Mr. Kittle would need to pay the $1,345 estimated fees in advance since he has no prior history of paying FOIA fees; and f) "since [they] are requiring advanced payment, [they] will not consider [his] request to be received and will not respond to it until [he] meets this requirement." *Id*.

141. The FCA FOIA Liaison proceeded to say that "a number of the 170 potentially responsive documents will be subject to multiple FOIA exemptions" and "will most likely be exempt from mandatory disclosure in their entirety under the bank examination privilege." *Id*.

142.   However, according to the FOIA logs published by the FCA, the FCA has not required any other FOIA requestor to pay a fee for at least the last four years, aside from Mr. Kittle for his 2023 request for FCA's records related to its investigation into his borrower complaint.

143.   More recently, upon Mr. Kittle's attorney submitting a request under the Freedom of Information Act for certain records and requesting a fee waiver, FCA denied the fee waiver request and initially attempted to charge his attorney a fee of $5,203. After Mr. Kittle's attorney attempted to lessen the fees by narrowing the FOIA request, the FCA instead increased the fees charged from $5,203 to $58,129 before it will produce the responsive documents. Exhibit J.

144.   Upon Mr. Kittle's attorney submitting a FOIA request for the FCA's annual report to the Consumer Financial Protection Bureau on consumer compliance in the System, including the ECOA, the FCA initially provided a no records response, saying, "Please note that FCA does not provide an annual report to the CFPB on consumer compliance in the Farm Credit System." After being confronted with two internal FCA documents about the annual report on consumer compliance to the CFPB, the FCA revised its response and provided the records. Exhibit K.

## CLAIMS FOR RELIEF

## <u>COUNT ONE – VIOLATION OF THE U.S. CONSTITUTION, ART. II, § 3</u>
### (Count One asserted only as to Defendant Joseph R. Biden, Jr.)

145. Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

146. The U.S. Constitution imposes upon the President a mandatory duty to "take Care that the Laws will be faithfully executed." U.S. Const. art. II, § 3.

147. The President's duty includes the faithful execution of 12 U.S.C. § 2242(a), which explicitly requires the appointment of the three-member FCA Board.

148. The Farm Credit Act, pursuant to 12 U.S.C. § 2242(a), vests in the President the exclusive authority and *obligation* to appoint the FCA Board members.

149. The duty is nondiscretionary, as the statute employs the imperative "shall" and provides no exception or discretion to refrain from making such appointments.

150. Throughout his tenure, President Biden failed to appoint a full three-member FCA Board pursuant to the statutory mandate of the Farm Credit Act.

151. Although Mr. Hall's term on the FCA Board expired prior to President Biden being sworn into office on January 20, 2021, President Biden never made a nomination to fill Mr. Hall's FCA Board position over the duration of his term.

152. President Biden's inaction constitutes a direct violation of both 12 U.S.C. § 2242(a) and Article II, Section 3 of the United States Constitution.

153.  As a direct and proximate result of President Biden's failure to appoint a full FCA Board pursuant to the statutory mandate of the Farm Credit Act, the Plaintiff suffered tangible harm, including the loss of statutory borrower rights, economic injury from forced loan repayment, and the inability to seek redress due to the FCA's impaired enforcement capacity.

154.  The Plaintiff's injuries are traceable to President Biden's dereliction of duty and continue to affect the Plaintiff and other Farm Credit System borrowers.

155.  Pursuant to 28 U.S.C. § 2201, this Court has authority to "declare the rights and other legal relations of any interested party seeking such declaration" in a case of actual controversy within its jurisdiction.

156.  An actual controversy exists, as President Biden's failure to act violated a clear legal duty, caused specific harm to Plaintiff, and left unresolved legal questions regarding the obligations of the Executive Branch under the Farm Credit Act.

157.  A declaratory judgment is necessary to establish President Biden's inaction was unlawful and to guide future Executive action to prevent a recurrence of harm.

158.  The Plaintiff lacks an adequate alternative remedy to address the Constitutional and statutory violations committed by President Biden.

159.  The requested declaratory relief is the appropriate mechanism to vindicate the Plaintiff's rights and to affirm the legal duty breached by President Biden.

**COUNT TWO – VIOLATION OF THE FARM CREDIT ACT**
**(Count Two asserted only as to Defendant Jeffery S. Hall)**

160. Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

161. Pursuant to 12 U.S.C. § 2242(a), the FCA Board consists of three (3) members appointed by the President, by and with the advice and consent of the Senate, each serving a single term of six (6) years.

162. The statute explicitly states that "no member may serve more than one term," establishing a clear prohibition on consecutive terms beyond the six-year period.

163. Additionally, while U.S.C. § 2242(a) permits a Board member to continue serving after the expiration of their term "until a successor has been appointed and qualified," this holdover provision does not authorize service beyond one term or extend eligibility for a second consecutive term; as it is prohibited by federal law.

164. Term limits ensure Board renewal and prevent prolonged tenure, consistent with Congress's intent for effective governance through staggered appointments.

165. Mr. Hall was appointed to the FCA Board by President Obama, with Senate confirmation, and began his initial six-year term on March 17, 2015.

166. As a "mid-term" appointment, Mr. Hall's term on the FCA Board then expired on October 13, 2018; while President Trump nominated Rodney K. Brown ("Mr. Brown") to fill Mr. Hall's position in 2019 and 2020, Mr. Brown was denied a Senate Confirmation hearing and his nomination was returned to President Trump.

167. Mr. Hall has remained on the FCA Board in a holdover capacity since October 13, 2018; which extended the duration of President Biden's tenure.

168. As of the filing of this Amended Complaint, Mr. Hall continues to serve on the FCA Board, having begun what is now his third term as of October 13, 2024.

169. Mr. Hall is the longest serving Board member in the history of the FCA.

170. Mr. Hall's prolonged holdover status undermines the statutory intent of staggered, limited terms and constitutes an unlawful extension of authority.

171. Any claim by Mr. Hall to serve a second, and now third, consecutive term directly contravenes the statutory limit of one term per FCA Board member.

172. Mr. Hall's unlawful service has directly harmed the Plaintiff, as the FCA Board lacks the capacity to effectively oversee the FCA's regulatory and enforcement functions and, given the stagnation, has denied Plaintiff the opportunity to seek redress with an FCA Board removed from the conflicts of his allegations.

173. The Plaintiff is entitled to a properly constituted FCA Board to enforce his statutory rights pursuant to the Farm Credit Act and other applicable federal laws.

174. As a direct and proximate result of Mr. Hall's unlawful service on the FCA Board, the Plaintiff gas suffered tangible harm, including the loss of statutory borrower rights, economic injury from forced loan repayment, and the inability to seek redress due to the FCA's impaired enforcement capacity.

175.   Pursuant to 28 U.S.C. § 2201, this Court has authority to "declare the rights and other legal relations of any interested party seeking such declaration" in a case of actual controversy within its jurisdiction.

176.   An actual controversy exists, as Mr. Hall's service on the FCA Board past one (1) term violates U.S.C. § 2242(a), harms Plaintiff and the Farm Credit System.

177.   A declaratory judgment is necessary to confirm Mr. Hall's tenure as unlawful, to ensure compliance with the Farm Credit Act, and to protect the Plaintiff's rights.

## COUNT THREE – NEGLIGENCE UNDER THE FTCA (28 U.S.C. § 1346(b))
### (Count Three asserted only as to Defendant FCA)

178.   Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

179.   The FCA had a non-discretionary duty to timely investigate borrower complaints within 60 days, as mandated by FCA Policies and Procedures Manual 501, and to enforce borrower rights under the Farm Credit Act (e.g., 12 U.S.C. § 2201, FCA-PS-80).

180.   The FCA breached this duty by failing to investigate Plaintiff's complaint within 60 days, taking 657 days instead, and by refusing to enforce its findings against AFC, despite confirming violations on June 12, 2023.

181.   The FCA's breach proximately caused Plaintiff's injuries, as its inaction allowed AFC to escalate violations, forcing Plaintiff to pay off loans early and

liquidate assets, which the AFC could have prevented with timely intervention, and/or redressed upon confirming violations on June 12, 2023.

182. Plaintiff suffered economic losses of at least $4,800,000, including the loss of his agricultural business, real property, livestock, equipment, and future income.

183. The FCA's duty to investigate within 60 days is not subject to the discretionary-function exception (28 U.S.C. § 2680(a)), as supported by *L.C. v. United States*, 83 F.4th 534 (6th Cir. 2023), where failure to follow mandatory policies negated the exception.

184. Plaintiff submitted a Standard Form 95 to the FCA on April 29, 2024, within two years of June 12, 2023, when the FCA issued its findings.

185. The claim accrued on June 12, 2023, when Plaintiff first knew or should have known the full extent of the FCA's negligence, as the FCA's ongoing assurances of investigation delayed his realization of its failure to act (discovery rule).

186. The FCA-s 657-delay, coupled with repeated assurances of investigation, constitutes a continuing violation, with the last wrongful act occurring on June 12, 2023, when the FCA refused to enforce its findings.

187. The FCA's assurances that it was investigating (e.g., from August 26, 2021 through June 12, 2023) misled Plaintiff into delaying his claim, justifying equitable tolling of the two-year statute of limitation ((28 U.S.C. § 2401(b)).

## COUNT FOUR – VIOLATION OF FIFTH AMENDMENT – DUE PROCESS
### (Count Four asserted as to Defendants FCA, Hall, and Laguarda)

188.   Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

189.   The Fifth Amendment to the U.S. Constitution provides that no person shall be deprived of property without due process of law.

190.   Plaintiff, as a borrower and stockholder of the Farm Credit System, has a protected property interest in his statutory rights under the Farm Credit Act of 1971, as amended (12 U.S.C. §§ 2199-2202e), including the right to fair credit consideration, protection from retaliation, and equitable treatment by System institutions, as well as in his farm assets and equity, access to credit, and Class A Voting Stock, which he was forced to liquidate to avoid wrongful foreclosure.

191.   Defendants have deprived Plaintiff of these property interest by failing to enforce the Farm Credit Act and Equal Credit Opportunity Act (15 U.S.C. § 1691) against Alabama Farm Credit, despite finding numerous violations of Plaintiff's rights, and by delaying a response to Plaintiff's borrower compliant for 657 days, forcing Plaintiff to pay off his loans to avoid foreclosure.

192.   The FCA's lack of a formal administrative process for reviewing borrower complaints and its refusal to provide meaningful relief or enforcement denied

Plaintiff any adequate procedural mechanism to protect his property interests, constituting a violation of procedural due process.

193.   This deprivation was exacerbated by the FCA's allowance of retaliation by AFC against Plaintiff for exercising his rights, including threats of foreclosure and credit denials despite Plaintiff's current payment status.

194.   Defendants' collective actions and inactions have caused Plaintiff direct financial harm, including the loss of his lending relationship, equity access, and farm assets, without notice or an opportunity to be heard in a timely and meaningful manner.

195.   Plaintiff has no adequate remedy at law absent judicial intervention to compel Defendants to fulfill their constitutional and statutory duties.

## COUNT FIVE – MANDAMUS FOR ENFORCEMENT OF THE EQUAL CREDIT OPPORTUNITY ACT (28 U.S.C. § 1361)
**(Count Five asserted only as to Defendant FCA)**

196.   Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

197.   Under 28 U.S.C. § 1361, this Court has jurisdiction to compel an officer or agency of the United States to perform a duty owed to the Plaintiff.

198.   The Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, prohibits discrimination in credit transactions, including conditioning credit on unlawful

terms or discouraging applications. Pursuant to 15 U.S.C. § 1607(5), the FCA is mandated to enforce ECOA compliance by Farm Credit System institutions.

199. The FCA, in its June 12, 2023 findings, confirmed that AFC violated ECOA by conditioning Plaintiff's credit transactions on a release of liability and discouraging him from pursuing credit applications, actions explicitly prohibited under 12 C.F.R. § 1002.4(b) and other ECOA regulations.

200. Despite these findings, the FCA has failed and refused to exercise its enforcement authorities to require AFC to correct these ECOA violations, a duty they owe to Plaintiff as an affected borrower.

201. This failure constitutes a breach of a clear, nondiscretionary duty under 15 U.S.C. § 1607(5), as the FCA has no discretion to ignore confirmed violations of ECOA once identified through its examination process.

202. Plaintiff has a clear right to ECOA enforcement as a borrower harmed by AFC's discriminatory practices, including financial loss and the termination of his lending relationship.

203. No adequate alternative remedy exists, as the FCA's administrative process lacks authority to provide personal relief, and no private cause of action is available under ECOA against the FCA for its inaction (distinguishing this from potential claims against AFC).

204.   Absent mandamus relief, Plaintiff will continue to suffer irreparable harm from Defendants' refusal to enforce ECOA, perpetuating the violations identified in June 2023.

## COUNT SIX – BREACH OF FIDUCIARY DUTY

### (Count Six asserted only as to Defendant FCA)

205.   The FCA, funded by borrowers like Plaintiff, has a regulatory role encompassing a duty to protect their interests (12 U.S.C. § 2241 *et seq.*).

206.   The FCA owes a fiduciary-like duty to System borrowers, including Plaintiff, to ensure the Act's borrower rights are enforced.

207.   Its failure to act on known violations and to establish a complaint process breaches this duty, causing harm to Plaintiff.

## COUNT SEVEN – VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT – UNLAWFUL WITHHOLDING AND UNREASONABLE DELAY OF AGENCY ACTION (5 U.S.C. § 706(1))
### (Count Seven asserted only as to Defendant FCA)

208.   Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

209.   Under the Administrative Procedure Act ("APA"), the Court may compel agency action that has been unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

210.  The FCA is statutorily required to enforce the borrower rights provisions of the Farm Credit Act and ensure compliance with applicable federal laws and regulations, including the Equal Credit Opportunity Act.

211.  Plaintiff submitted a borrower complaint to the FCA on August 24, 2021, detailing violations of the Farm Credit Act and ECOA by Alabama Farm Credit.

212.  FCA's own policies set a goal of resolving borrower complaints within 60 days. However, the FCA failed to provide a substantive response until June 12, 2023—657 days after the initial complaint.

213.  FCA's failure to act in a timely manner caused Plaintiff significant financial harm, including the forced liquidation of assets, loss of his home, and exclusion from the Farm Credit System.

214.  The FCA's prolonged and unjustified delay in investigating and enforcing borrower protections constitutes an unlawful withholding and unreasonable delay of agency action in violation of the APA, 5 U.S.C. § 706(1).

215.  Plaintiff seeks an order compelling FCA to establish and enforce a process for timely and effective resolution of borrower complaints, as required by law.

# COUNT EIGHT: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – ARBITRARY AND CAPRICIOUS AGENCY ACTION
## (5 U.S.C. § 706(2)(A))
**(Count Eight asserted only as to Defendant FCA)**

216.   Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

217.   The APA prohibits agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

218.   The FCA, despite finding numerous violations of the Farm Credit Act and ECOA by Alabama Farm Credit, ACA, failed to take enforcement action or provide Plaintiff any form of relief.

219.   The FCA simultaneously asserts that it has enforcement authority yet refuses to act, contradicting its own regulations and policies.

220.   FCA's failure to enforce borrower protections, despite clear evidence of violations, demonstrates arbitrary and capricious decision-making.

221.   Plaintiff has suffered direct harm as a result of the FCA's refusal to fulfill its statutory duties.

222.   Plaintiff seeks declaratory and injunctive relief requiring the FCA to fulfill its enforcement obligations under federal law.

## COUNT NINE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – FAILURE TO FOLLOW REQUIRED PROCEDURES (5 U.S.C. § 706(2)(D))
### (Count Nine asserted only as to Defendant FCA)

223.   Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

224.   The APA requires agencies to follow required procedures when implementing and enforcing federal laws. 5 U.S.C. § 706(2)(D).

225.   The FCA has no formalized or transparent administrative process for handling borrower complaints and enforcement of borrower rights under the Farm Credit Act or ECOA.

226.   FCA's failure to establish clear procedures deprived Plaintiff of due process and meaningful recourse for the violations he suffered.

227.   FCA's internal dysfunction, including the continued use of outdated and draft policies, exacerbated the harm to Plaintiff.

228.   Plaintiff seeks an order requiring FCA to establish and adhere to clear administrative procedures for handling borrower complaints and enforcing borrower protections.

## COUNT TEN: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – FAILURE TO ENFORCE AGENCY REGULATIONS (5 U.S.C. § 706(1))
### (Count Ten asserted only as to Defendant FCA)

229.   Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

230.   The FCA has a statutory duty to ensure Farm Credit System institutions comply with borrower rights provisions under the Farm Credit Act and ECOA.

231.   The FCA failed to take enforcement action despite finding violations of these laws by Alabama Farm Credit, ACA.

232.   FCA's refusal to exercise its enforcement authority has rendered the borrower protections meaningless, harming Plaintiff and other similarly situated borrowers.

233.   FCA's failure to act constitutes an abdication of its statutory responsibilities, in violation of the APA.

234.   Plaintiff seeks declaratory and injunctive relief compelling the FCA to exercise its enforcement powers and ensure compliance with federal law.

## COUNT ELEVEN: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – ARBITRARY AND CAPRICIOUS CONDUCT (5 U.S.C. § 706(2)(A))
### (Count Eleven asserted only as to Defendant Laguarda)

235.   Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

236.  Defendant Wendy Laguarda, in her capacity as FCA Inspector General, was responsible for conducting independent audits, inspections, and investigations of the FCA and its operations, including borrower complaints.

237.  Laguarda engaged in conduct that compromised the independence and integrity of the FCA's Office of Inspector General (OIG), including allegedly reducing the scope of FCA audits to protect senior FCA officials and improperly seeking legal advice from FCA's Office of General Counsel, creating a conflict of interest.

238.  Her failure to independently investigate misconduct within the FCA, including the agency's failure to enforce borrower rights, deprived Plaintiff of an impartial review process and accountability for FCA's unlawful actions.

239.  This conduct was arbitrary, capricious, and contrary to law, warranting judicial intervention under the APA.

**COUNT TWELVE: FAILURE TO PERFORM A NONDISCRETIONARY DUTY UNDER THE INSPECTOR GENERAL ACT (5 U.S.C. § 706(1), 5 U.S.C. App. 3 (Inspector General Act)) (Count Twelve asserted only as to Defendant Laguarda)**

240.  Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

241.  Under the Inspector General Act of 1978, as amended, Inspector Generals have a mandatory duty to conduct independent audits and investigations into

allegations of fraud, waste, abuse, and violations of law within the agencies they oversee.

242.  Laguarda failed to fulfill this duty by improperly narrowing the scope of investigations into FCA misconduct, dismissing credible allegations of wrongdoing, and failing to hold FCA officials accountable for violations of borrower protections under the Farm Credit Act and ECOA.

243.  Laguarda's failure to act constitutes an unlawful withholding of agency action, in violation of 5 U.S.C. § 706(1).

244.  Plaintiff seeks an order compelling an independent review of FCA OIG's handling of borrower complaints and the FCA's failure to enforce borrower protections.

## COUNT THIRTEEN: RETALIATION AND ABUSE OF AUTHORITY UNDER THE FREEDOM OF INFORMATION ACT (FOIA) (5 U.S.C. § 552)
### (Count Thirteen asserted only as to Defendant Laguarda)

245.  Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

246.  Plaintiff submitted a FOIA request to the FCA for records related to the investigation into his borrower complaint.

247.  Under Laguarda's tenure as Inspector General, the FCA improperly attempted to charge Plaintiff exorbitant fees for the requested documents, despite no prior history of fee imposition in similar cases.

248. The FCA initially denied the existence of certain records, only revising its response after being confronted with evidence of the records' existence.

249. These actions suggest an attempt to obstruct Plaintiff's access to information, potentially in retaliation for Plaintiff's borrower complaint and legal challenges against the FCA.

250. Laguarda's conduct and oversight failures contributed to this abuse of FOIA procedures, warranting declaratory and injunctive relief to prevent further retaliatory practices.

## PRAYER FOR RELIEF.

WHEREFORE, Plaintiff requests the following relief:

As to all Defendants:

    a) A Declaratory Judgment pursuant to 28 U.S.C. § 2201 that all Defendants violated Plaintiff's Fifth Amendment due process rights by depriving him of property interests without adequate process; and

    b) Such other and further relief as this Court may deem just and proper.

As to the Defendant Joseph R. Biden, Jr., in his official capacity as President of the United States of America:

    a) A Declaratory Judgment pursuant to 28 U.S.C. § 2201 that President Biden, during his term from January 20, 2021 to January 20, 2025, violated 12 U.S.C. § 2242(a) and Article II, Section 3 of the United

States Constitution by failing to appoint all positions on the FCA Board, as he was obligated and required to do pursuant to federal law;

b) Awarding Plaintiff's attorneys' fees and costs pursuant to 28 U.S.C. § 2412, as applicable; and

c) Such other and further relief as this Court may deem just and proper.

As to the Defendant Jeffery S. Hall, in his official capacity as FCA Board Chairman and Chief Executive Officer:

a) A Declaratory Judgment pursuant to 28 U.S.C. § 2201 that Mr. Hall's service on the FCA Board beyond October 13, 2021 and up to present, constitutes an unlawful extension beyond the one-term limit of 12 U.S.C. § 2242(a), whether as a second, and now third, consecutive term or as an impermissible holdover in direct contravention of Congressional intent;

b) Awarding Plaintiff's attorneys' fees and costs pursuant to 28 U.S.C. § 2412, as applicable; and

c) Such other and further relief as this Court may deem just and proper.

As to the Farm Credit Administration and the Defendant Jeffery S. Hall, in his official capacity as FCA Board Chairman and Chief Executive Officer:

d) A writ of mandamus pursuant to 28 U.S.C. § 1361 directing Defendants FCA and Hall, within 30 days of the order, to exercise their enforcement authorities under 15 U.S.C. § 1607(5) to require Alabama Farm Credit to

correct the ECOA violations identified in the FCA's June 12, 2023 findings;

As to the Farm Credit Administration:

a) Monetary damages of no less than $4,800,000 for economic losses caused by the FCA's negligence;

b) Declare that Defendants have unlawfully withheld and unreasonably delayed agency action in violation of the APA;

c) Declare that Defendant's failure to enforce borrower protections under the Farm Credit Act and ECOA is arbitrary, capricious, and contrary to law;

d) Order Defendant to establish and adhere to a formalized process for the timely resolution of borrower complaints;

e) Order Defendant to take enforcement action in accordance with federal law and ensure compliance by Farm Credit System institutions;

f) Order Defendant to release all improperly withheld FOIA records without unlawful fees or redactions;

g) Award Plaintiff reasonable attorney's fees and costs incurred in bringing this action; and

h) Any other relief as this Court may deem just and proper.

As to Wendy R. Laguarda:

a) Declare that Defendant Laguarda's actions were arbitrary, capricious, and contrary to law under the APA;

b) Declare that Defendant Laguarda unlawfully withheld agency action in violation of the Inspector General Act and APA;

c) Declare that Defendant Laguarda's actions violated Plaintiff's Fifth Amendment due process rights;

d) Order an independent review of the FCA OIG's handling of borrower complaints and enforcement responsibilities;

e) Award Plaintiff reasonable attorney's fees and costs; and

f) Any other relief as this Court may deem just and proper.

DATED: March 3, 2025.

Respectfully submitted,

/s/ Ashley M. Posey
Ashley M. Posey (BPR 037411)
Attorney for Plaintiff
**HUMBLE LAW, LLC**
2310 Santa Fe Pike
Columbia, Tennessee 38401
Telephone: (205) 358-3100
Email: ashley@humble.law

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2025, a copy of the foregoing was filed electronically. A copy will be sent to the following by operation of the Court's CM/ECF system:

Kimberly S. Veirs, Esq.
Assistant U.S. Attorney
719 Church Street, Suite 3300
Nashville, Tennessee 37203
*Attorney for Defendants*

s/Ashley M. Posey
Ashley M. Posey (BPR 037411)
Attorney for Plaintiff